IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

MONIQUE JOHNSON, JAVIER PARRA, TAURI PHILLIPS, AUTUMN ROSEBOROUGH, and ANTHONY J. SCOTT, Individually and on Behalf of All Others Similarly Situated, on Behalf of the WELLS FARGO & COMPANY 401(K) PLAN

Plaintiffs,

v.

WELLS FARGO & COMPANY; BOARD OF DIRECTORS OF WELLS FARGO & COMPANY, and its members; the WELLS FARGO EMPLOYEE BENEFIT REVIEW COMMITTEE, and its members; and the HEAD OF HUMAN RESOURCES, HEAD OF TOTAL REWARDS, and HEAD OF BENEFITS of WELLS FARGO & COMPANY, in their capacities as Plan Administrator of the Wells Fargo & Company 401(k) Plan

Defendants.

Case No. 26-CV-4297

**CLASS ACTION COMPLAINT**

**Table of Contents**


INTRODUCTION ........................................................ 1

NATURE AND SUMMARY OF THE ACTION ........................................................ 1

JURISDICTION AND VENUE ........................................................ 7

THE PARTIES ........................................................ 7

I. Plaintiffs ........................................................ 7

II. Defendants ........................................................ 9

SUBSTANTIVE ALLEGATIONS ........................................................ 11

I. The Plan ........................................................ 11

II. The Large Cap Growth Fund ........................................................ 13

III. The Small Cap Fund ........................................................ 16

IV. The State Street TDF Series ........................................................ 17

V. Defendants Breached Their Fiduciary Duties Under ERISA ........................................................ 22

A. Fiduciary Duties Under ERISA ........................................................ 22

1. Fiduciary Duties of Prudence and Loyalty ........................................................ 22

2. Fiduciary Liability Under ERISA ........................................................ 24

3. Co-fiduciary Liability ........................................................ 25

B. The Large Cap Growth Fund Consistently Underperformed as Compared to Meaningful Benchmarks ........................................................ 25

1. Meaningful Benchmarks to Compare the Investment Performance of the Large Cap Growth Fund ........................................................ 26

2. The Large Cap Growth Fund Consistently Underperformed as Compared to the Meaningful Benchmarks ........................................................ 36

C. The Small Cap Fund Consistently Underperformed as Compared to Meaningful Benchmarks ........................................................ 43

1. Meaningful Benchmarks to Compare the Investment Performance of the Small Cap Fund ........................................................ 44

2. The Small Cap Fund Consistently Underperformed as Compared to the Meaningful Benchmarks ........................................................ 54

D. The State Street TDF 2035–2060 Series Consistently Underperformed as Compared to Meaningful Benchmarks ........................................................ 62

1. The Prospectus Benchmark Used to Analyze the Performance of the State Street TDF Series Is Inappropriate ..... 63

2. Meaningful Benchmarks to Compare the Investment Performance of the State Street TDF Series ..... 66

3. The State Street TDF Series Consistently Underperformed as Compared to the Comparator TDFs ..... 73

E. Defendants Violated Their ERISA Fiduciary Duties by Failing to Timely Remove the Consistently Underperforming Challenged Funds ..... 91

F. Prior Litigation Put Wells Fargo on Notice of Its Imprudent Process ..... 97

G. Plaintiffs' Claims Are Timely ..... 99

CLASS ACTION ALLEGATIONS ..... 99

CAUSES OF ACTION ..... 103

COUNT I ..... 103

COUNT II ..... 107

COUNT III ..... 109

PRAYER FOR RELIEF ..... 112

| Table of Select Defined Terms | | |
|---|---|---|
| **Term** | **Defined at** | **Definition** |
| **Allspring** | ¶ 137 | Allspring Global Investments, LLC, together with the subsidiary that managed the Small Cap Fund's Emerging Growth sleeve. |
| ***Alpha*** | ¶ 97 | The Fund's annual return less its benchmark's. |
| ***Becker* Action** | ¶ 12 | *Becker v. Wells Fargo & Co.*, No. 20-cv-2016 (D. Minn.). |
| **Challenged Funds** | ¶ 3 | The Large Cap Growth Fund, the Small Cap Fund, and the State Street TDF Series, collectively. |
| **Class** | ¶ 231 | The class Plaintiffs seek to represent: all participants and beneficiaries of the Plan who invested in one or more of the Challenged Funds during the Class Period, with the exclusions stated after ¶ 231. |
| **Class Period** | ¶ 9 | October 5, 2020 to the date of judgment. |
| **Comparator Funds** | ¶ 97 | For each Challenged Fund, the LCG Comparator Funds, the SC Comparator Funds, or the Comparator TDFs identified in the corresponding section. |
| **Comparator TDFs** | Note 43 | Fidelity Freedom K6, Vanguard Target Retirement (Investor), and American Funds Target Date Retirement R-6, collectively. |
| ***Delta*** | ¶ 97 | The Fund's annual return less the Comparator Funds' average annual return. |
| **Large Cap Growth Fund / LCG Fund** | ¶ 3; ¶¶ 40–41 | The Plan's Large Cap Growth Fund, an investment option in the Plan since October 2009, a diversified, multi-manager U.S. large cap growth equity fund issued by Wells Fargo. |
| **LCG Comparator Funds** | Note 19 | American Century Growth R6 ("AGRDX"), Loomis Sayles Growth Fund Class Y ("LSGRX"), Janus Henderson Forty I ("JCAPX"), and JPMorgan Large Cap Growth R6 ("JLGMX"), collectively. |
| **Plan** | Intro | The Wells Fargo & Company 401(k) Plan. |
| **Prospectus Benchmark** | ¶ 9 | The benchmark each Challenged Fund's disclosures name: the Russell 1000 Growth for the Large Cap Growth Fund, the Russell 2000 for the Small Cap Fund, and the Morningstar Index for the State Street TDF Series. |

| Table of Select Defined Terms | | |
|---|---|---|
| **Term** | **Defined at** | **Definition** |
| **SC Comparator Funds** | Note 29 | DFA U.S. Small Cap Institutional (“DFSTX”), Nuveen Quant Small Cap Equity R6 (“TISEX”), Federated Hermes MDT Small Cap Core R6 (“QLSCX”), Fidelity Advisor Small Cap I (“FSCIX”), collectively. |
| **Small Cap Fund / SC Fund** | ¶ 3; ¶¶ 49, 51 | The Plan’s Small Cap Fund, an investment option in the Plan since October 2009, a diversified, multi-manager U.S. small cap equity fund issued by Wells Fargo and invested through five sleeves, one of them an index fund. |
| **State Street TDF Series / SS TDF** | ¶ 3; ¶ 59 | State Street’s Target Retirement funds in the vintages from 2035 to 2060, held through the Non-Lending Series Funds Class A units from March 31, 2023 into 2026 and through the Securities Lending Series Funds Class III units since. |
| **TDFs** | ¶ 3 | Target date funds. |

## INTRODUCTION

Plaintiffs Monique Johnson, Javier Parra, Tauri Phillips, Autumn Roseborough, and Anthony J. Scott ("Plaintiffs"), individually, on behalf of the Wells Fargo & Company 401(k) Plan (the "Plan"), and as representatives of a class of participants and beneficiaries of the Plan, by and through their counsel, bring this Complaint for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA") against defendants Wells Fargo & Company ("Wells Fargo"), the Board of Directors of Wells Fargo and its members (the "Board"), the Wells Fargo Employee Benefit Review Committee and its members (the "Committee"), and Wells Fargo's Head of Human Resources, Head of Total Rewards, and Head of Benefits, in their capacities as the administrator of the Plan (the "Plan Administrator") (collectively, "Defendants").

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE AND SUMMARY OF THE ACTION

1. This is a class action brought on behalf of the Plan, and a class of participants and beneficiaries of the Plan, against fiduciaries of the Plan arising from their breaches of fiduciary duties under ERISA.

2. ERISA requires fiduciaries of retirement plans to closely monitor investments, remove imprudent investments, and make investment decisions based solely in the interests of the participants in retirement plans. *See* 29 U.S.C. § 1104(a)(1). ERISA

fiduciaries "are bound by the duties of loyalty and prudence, which courts have described as the 'highest known to the law.'" *Snyder v. UnitedHealth Grp., Inc.*, No. 21-cv-1049 (JRT/DJF), 2024 WL 1076515, at *6 (D. Minn. Mar. 12, 2024) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)).

3. Here, Plaintiffs bring this action under 29 U.S.C. §§ 1132(a)(2) and (a)(3) alleging that Defendants—the Plan's fiduciaries—breached their duties by: (1) retaining two underperforming, actively managed investment options—the Large Cap Growth Fund (the "LCG Fund") and the Small Cap Fund (the "SC Fund")—for the Plan after a prudent fiduciary would have removed them, and selecting State Street's Target Retirement funds in the vintages ranging from 2035 to 2060 (the "State Street TDF Series,"[1] and collectively with the LCG Fund and the SC Fund, the "Challenged Funds"), for the Plan in March 2023 and retaining it thereafter, despite more suitable large cap growth, small cap, and target date funds ("TDFs") having been readily available; (2) failing to properly monitor the fiduciaries responsible for administration and management of the Plan's actions; and (3) causing the Plan to pay, directly or indirectly from Plan assets, investment management fees to a party in interest.

---

[1] The Plan has held State Street's Target Retirement funds in vintages at five-year increments and an Income vintage, through the State Street Target Retirement Non-Lending Series Funds Class A from March 31, 2023 into 2026 and through the Class III units of the State Street Target Retirement Securities Lending Series Funds since. This action concerns six of those vintages: the State Street 2035, 2040, 2045, 2050, 2055, and 2060 TDFs; the returns pleaded for them from 2018 are those of the Class A units (note 44, *infra*). Unless otherwise specified, the term "State Street TDF Series" as used herein refers to these six specific vintages.

4. Defendants' breaches and imprudent investment decisions have resulted in losses to the Plan and its participants of approximately $1.04 billion, measured from the dates on which the LCG Fund and the SC Fund should have been removed (or, if later, from the start of the first full calendar year covered by this action) and, for the State Street TDF Series, from the start of the first full calendar year after its selection. Those losses exceed $950 million even when the SC Fund is measured from January 1, 2024, and they reach approximately $1.62 billion when measured against the strongest comparator for each Challenged Fund (approximately $1.53 billion with the SC Fund measured from January 1, 2024).[2]

5. The Plan is a defined contribution retirement plan under 29 U.S.C. § 1002(34) and is sponsored and administered by Wells Fargo. As evidenced by its tax-deferred qualities, the primary purpose of the Plan is to allow participants to save for retirement.

6. Wells Fargo is the "sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). Wells Fargo acts through a Board of Directors.

---

[2] As detailed in ¶¶ 216–220 and Table 10, the $1.04 billion figure aggregates the LCG Fund's shortfall against the average of the LCG Comparator Funds from January 1, 2021 ($699.3 million), the SC Fund's shortfall against the average of the SC Comparator Funds from January 1, 2023 ($187.0 million), and the six State Street TDF Series vintages' shortfall against the average of the Comparator TDFs from January 1, 2024 ($153.8 million), each as defined below. The $950.7 million figure measures the SC Fund from January 1, 2024 instead ($97.6 million); and the $1.62 billion figure aggregates the shortfalls against the strongest comparator of each Challenged Fund—LSGRX ($1.08 billion), TISEX ($289.4 million), and the Fidelity Freedom vintages ($243.2 million).

7. Wells Fargo's Employee Benefit Review Committee is responsible for the selection and monitoring of the investment funds offered within the Plan.

8. When designating the different investment options for inclusion in the Plan, Defendants were required to independently investigate and regularly monitor each of the Plan's investment options with the care and skill of a prudent investor. 29 U.S.C. § 1104(a)(1)(B).

9. Rather than acting diligently and prudently, Defendants breached their fiduciary duties by retaining (i) the LCG Fund as an investment option for the Plan during the entirety of the "Class Period" (October 5, 2020 to the date of judgment), despite the LCG Fund having underperformed both the benchmark named in its disclosures (its "Prospectus Benchmark") and the average of the LCG Comparator Funds (defined below) on a trailing three-year basis for eight consecutive years (2018–2025), on a trailing five-year basis for six consecutive years (2020–2025), on a trailing ten-year basis for 2025, and on a cumulative compounded basis; and (ii) the SC Fund after its record turned at year-end 2022, despite the SC Fund having underperformed the average of the SC Comparator Funds (defined below) on a trailing three-year basis for five consecutive years (2021–2025), on a trailing five-year basis for four consecutive years (2022–2025), on a trailing ten-year basis for 2025, and on a cumulative compounded basis.

10. Defendants further breached their fiduciary duties by (i) selecting the State Street TDF Series for the Plan in March 2023, despite each of its vintages having underperformed the average of the Comparator TDFs on the trailing three- and five-year windows ending 2021 and 2022 and having trailed both the American and Fidelity

Comparator TDFs (defined below) on both windows ending 2022; and (ii) retaining the Series thereafter, despite each vintage having underperformed the average of the Comparator TDFs on every trailing three-, five-, and ten-year window computable from the pleaded returns and ending 2023, 2024, or 2025 (the ten-year windows being those ending 2023 through 2025 for the 2035 through 2055 vintages and 2025 for the 2060 vintage), and on a cumulative compounded basis.

11. The Challenged Funds suffered from ongoing quantitative deficiencies resulting in massive underperformance relative to that of well-established, prudently managed, comparable funds that Defendants could have selected for the Plan.

12. Wells Fargo had already been sued over the Plan's investments. On March 13, 2020, a Plan participant filed the action that became *Becker v. Wells Fargo & Co.*, No. 20-cv-2016 (D. Minn.) (the "*Becker* Action") against Wells Fargo, the Committee, and others, alleging, in the words of the Plan's Form 5500 filings, "that several investment options in the Plan charged excessive fees, underperformed comparable to investment alternatives, and paid fees to Wells Fargo." The challenged investments included the SC Fund's Emerging Growth sleeve and the Plan's target date funds. This Court denied the defendants' motion to dismiss on May 12, 2021, and approved a $32.5 million class settlement on August 31, 2022. Yet Wells Fargo retained that same Emerging Growth sleeve in the SC Fund for fourteen months after the settlement became final. Wells Fargo also retained the LCG Fund and the SC Fund after each had fallen behind the average of its comparators over both the trailing three- and five-year periods. And within six months after the settlement became final, Wells Fargo selected as the Plan's target date series and

default investment a series whose published record trailed the American and Fidelity Comparator TDFs (defined below).

13. Defendants also kept a Wells Fargo proprietary fund inside the SC Fund. The Wells Fargo Emerging Growth Fund was managed by a subsidiary of Allspring Global Investments, LLC, in which Wells Fargo holds a noncontrolling interest; the Plan's schedules of assets mark it as a party-in-interest holding, and it was one of the investments challenged in the *Becker* Action. Defendants kept that sleeve in the SC Fund,[3] and, on information and belief, caused the Plan to pay, directly or indirectly from Plan assets, the investment management fees on that sleeve, for fourteen months after the *Becker* settlement became final on October 3, 2022, until December 4, 2023.

14. Based on Defendants' conduct, Plaintiffs bring this action on behalf of the Plan, and as representatives of a class of participants and beneficiaries of the Plan, asserting claims for breach of the fiduciary duty of prudence (Count One), for failure to monitor fiduciaries (Count Two), and for prohibited transactions (Count Three). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches, disgorgement of the fees paid to the party in interest, and other appropriate relief.

---

[3] As used in this Complaint, a "sleeve" is the portion of a multi-manager fund's assets allocated to one sub-advisor or underlying fund and managed under that manager's strategy. The Plan's schedules of assets list each sleeve of the LCG Fund and the SC Fund as a separate holding.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this action arises under 29 U.S.C. § 1132(a).

16. This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the Plan is administered—the Plan's administrator reports its address to the Department of Labor as MAC N9310-110, 550 South 4th Street, Minneapolis, Minnesota 55415—and in which at least one of the alleged breaches took place.

## THE PARTIES

### I. Plaintiffs

17. Plaintiffs bring this suit individually, on behalf of the Plan, and on behalf of a class of participants and beneficiaries of the Plan affected by the challenged conduct of Defendants.

18. Plaintiff Monique Johnson was employed as an employee relations consultant with Wells Fargo from 2022 through 2024, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. Johnson suffered individual injury by investing in the Plan's poorly performing State Street 2045 TDF. Johnson was invested in the State Street 2045 TDF during the Class Period, received a distribution of her account in 2024, and the distribution she received was reduced by the losses alleged herein.

19. Plaintiff Javier Parra was employed as a senior software engineer with Wells Fargo from October 2024 through March 2026, and was a participant in the Plan, as defined

in 29 U.S.C. § 1002(7), during the Class Period. Parra suffered individual injury by investing in the Plan's poorly performing State Street 2045 TDF. Parra was invested in the State Street 2045 TDF during the Class Period, and his account was reduced by the losses alleged herein.

20. Plaintiff Tauri Phillips was employed as a business service analyst with Wells Fargo from 2014 through 2025, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. Phillips suffered individual injury by investing in the Plan's poorly performing LCG Fund and State Street 2040 TDF. Phillips was invested in the LCG Fund and the State Street 2040 TDF during the Class Period, received a distribution of her entire account in 2025, and the distribution she received was reduced by the losses alleged herein.

21. Plaintiff Autumn Roseborough was employed as a business execution consultant with Wells Fargo from 2004 through November 2024, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. Roseborough suffered individual injury by investing in the Plan's poorly performing SC Fund. Roseborough was invested in the SC Fund during the Class Period, received a distribution of most of her account in 2024, and her account and that distribution were reduced by the losses alleged herein.

22. Plaintiff Anthony J. Scott was employed as a senior audit manager with Wells Fargo from 2017 through 2024, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. Scott suffered individual injury by investing in the Plan's poorly performing LCG Fund and SC Fund. Scott was invested in the LCG Fund

and the SC Fund during the Class Period, transferred his entire account out of the Plan in 2024, and the amount transferred was reduced by the losses alleged herein.

23. As detailed *infra*, the Plan has suffered losses of approximately $1.04 billion resulting from the fiduciary breaches at issue and remains vulnerable to continuing harm. Plaintiffs participated in the Plan during the Class Period, held the Challenged Funds in their accounts during that period, and suffered actual injuries to those accounts. Plaintiffs accordingly have standing to bring claims in a representative capacity on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2), and on behalf of all holders of the Challenged Funds. The alleged harms to holders of the Challenged Funds can be traced to the same challenged conduct: participants in the Plan suffered financial harm as a result of the Plan's imprudent investment options and the process Defendants used to monitor and retain the Challenged Funds. That same conduct with respect to the Plan harmed each holder of the Challenged Funds at issue in this action. A participant who has suffered injury in a plan may seek relief on the plan's behalf that "sweep[s] more broadly than the injury he personally suffered." *Braden*, 588 F.3d at 592.

## II. Defendants

24. Wells Fargo & Company ("Wells Fargo") is a publicly traded Delaware corporation headquartered in San Francisco, California, and serves as the overarching holding company for one of the world's largest financial services organizations. Wells Fargo and its affiliates provide a comprehensive suite of banking, investment, and mortgage products, as well as consumer and commercial finance, to a global client base including individual retail customers, small businesses, and large institutional entities.

Wells Fargo is an SEC-registered entity with its common stock listed on the New York Stock Exchange.

25. Wells Fargo is the "sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B) and is therefore a fiduciary responsible for ensuring the Plan is operated in compliance with ERISA. Additionally, as the entity responsible for appointing and monitoring the Plan's fiduciaries, including the Committee and its members, Wells Fargo had knowledge of the fiduciary breaches committed by the other Defendants, and did not make reasonable efforts under the circumstances to remedy those breaches.

26. The Plan Administrator is the administrator of the Plan within the meaning of 29 U.S.C. § 1002(16)(A). The Plan's Form 5500 filings identify the Plan Administrator as Wells Fargo's Head of Human Resources, Head of Total Rewards, and Head of Benefits (or the functional equivalent of each position), "each of whom may act individually or jointly as the Plan Administrator, or its authorized delegate." Before July 1, 2022, the 2021 filing identified Wells Fargo's Director of Human Resources and Director of Compensation and Benefits. The Plan's summary plan description identifies the same three positions and states that the Plan Administrator "has full discretionary authority to administer and interpret the 401(k) Plan." The Plan Administrator signs and files the Plan's annual reports on Form 5500. Those reports include the financial statements and schedules of assets that identify the Plan's investments, mark its party-in-interest holdings, describe its transactions with parties in interest, and describe the *Becker* Action and its settlement (¶¶ 137, 226–229, 260–264, *infra*). Because the Plan Administrator exercises discretionary

authority and discretionary responsibility in the administration of the Plan, it is a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

27. Wells Fargo's Employee Benefit Review Committee is responsible for the selection and monitoring of the investment options to be offered to participants. The Plan's summary plan description and prospectus state that the Committee (which those documents call the "EBRC") "is responsible for the selection and monitoring of the investment funds offered within the 401(k) Plan," that "[t]he Wells Fargo ESOP Fund is a required investment fund under the terms of the 401(k) Plan," and that "[a]ll other investment funds may be changed at the direction of the EBRC at any time." The Plan's Form 5500 filings likewise report that the Committee "has discretion under the Plan to select additional investment alternatives to be offered to participants." Current and former members of the Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and discretionary control respecting management of the Plan and the disposition of its assets.

28. The Board of Directors of Wells Fargo ("Board") is a fiduciary of the Plan responsible for appointing and monitoring the Plan's administrators and fiduciaries, including the Committee and its members.

## SUBSTANTIVE ALLEGATIONS

### I. The Plan

29. The Plan is a defined contribution plan subject to the provisions of ERISA.

30. A "defined contribution" plan is a retirement plan in which an individual account is set up for each participant with benefits based upon the amount contributed to

the participant's account (through employee contributions and, if applicable, employer contributions), and "any income, expenses, gains and losses." 29 U.S.C. § 1002(34).

31. The Plan is established and maintained under written documents as required by 29 U.S.C. § 1102(a).

32. Under the Plan, Wells Fargo pays the costs of administering the Plan and its trust, except for certain investment management fees, which are netted against the returns credited to participants' accounts, and a portion of the recordkeeping fees.[4]

33. Under the Plan, employees become eligible to make salary deferral contributions on the first day of the month following one full calendar month of service; employer matching and base contributions require one year of vesting service.

34. The Plan is a participant-directed defined contribution plan, meaning participants may direct the investment of their contributions into various investment options offered by the Plan. Defendants—through the Committee—determined the appropriateness of the Plan's investment offerings and monitored investment performance.

35. The Plan provides for retirement income for participants comprised of Wells Fargo and its subsidiaries' U.S.-based employees, former employees, and their beneficiaries.

36. Poor investment performance can significantly impair the value of a participant's account. Fiduciary decisions have the potential to dramatically affect the amount of money participants can save for retirement.

---

[4] 2024 Form 5500, financial statements, Note 2(b) (Administrative Expenses).

37. The Plan is one of the largest defined contribution plans in the country. At the beginning of the 2024 plan year, the Plan had 288,416 participants and thus had more participants than 99% of the defined contribution plans that filed Form 5500s for the 2023 plan year, the latest year abstracted in the Department of Labor's Private Pension Plan Bulletin (January 2026).

38. In 2024, the Plan had approximately $58 billion in assets entrusted to the care of the Plan's fiduciaries, holding more assets than 99% of the defined contribution plans that filed Form 5500s for the 2023 plan year, the latest year abstracted in the same bulletin.

39. As of December 31, 2024, approximately $4.1 billion, or approximately 7% of the Plan's total assets, was invested in the LCG Fund; approximately $1.64 billion, or approximately 2.8% of the Plan's total assets, was invested in the SC Fund; and approximately $6.2 billion, or approximately 10.8% of the Plan's total assets, was invested in the State Street TDF Series (2035–2060).

## II. The Large Cap Growth Fund

40. The Large Cap Growth Fund has been an investment option in the Plan since its inception in October 2009.

41. The LCG Fund is a diversified, multi-manager U.S. Large Cap Growth Equity fund that "seeks long-term capital appreciation."[5]

[5] LCG Fund, Morningstar Investment Profile as of January 31, 2026. Unless otherwise indicated, the LCG Fund's portfolio and expense data in this Complaint are as of that date.

42. Large-growth portfolios invest primarily in large U.S. companies expected to grow faster than other large-cap stocks. Stocks in the top 70% of the capitalization of the U.S. equity market are defined as large cap. Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields). Most large-growth portfolios focus on companies in rapidly expanding industries.[6]

43. An investment fund can be either passively or actively managed. Passive funds, such as "index funds," are meant to mirror the performance of an index. For example, a passive index fund pegged to the S&P 500 would hold securities of the same or similar type matching the composition of the S&P 500 Index. In contrast, actively managed funds are meant to beat the market through superior investment selection and are comprised of individual stocks, bonds, and/or assets selected by a manager or investment advisor.

44. The LCG Fund is issued by Wells Fargo and is actively managed by multiple sub-advisors. As of January 31, 2026, those sub-advisors were Los Angeles Capital, Jennison, T. Rowe Price, Brown Advisory, and Polen Capital, each managing roughly 20% of the LCG Fund's approximately $4.04 billion in assets; by June 30, 2026, the Polen sleeve had been replaced by a JPMorgan Chase Bank large cap growth collective fund, and each of the five sleeves held 20.00% of the LCG Fund's approximately $4.11 billion in assets.[7] The LCG Fund's sub-advisor roster has changed during the Class Period. The

---

[6] *Id.*

[7] LCG Fund, Morningstar Investment Profiles as of January 31 and June 30, 2026.

Plan's schedules of assets show three sleeves as of December 31, 2020 (Los Angeles Large Cap Growth Fund, T Rowe Price Blue Chip Growth Fund, Delaware US Growth Fund), five as of December 31, 2022 (Los Angeles Capital Large Cap Growth A, T Rowe Price Blue Chip Growth Trust T7, Polen Focus Growth CIT, Brown Advisory Sustainable Growth, Jennison Large Cap Growth), and five as of December 31, 2024 (T Rowe Price Blue Chip Growth Trust T7, SEI Investments Focus Growth CIT, Brown Advisory Sustainable Growth, LACM US Large Cap Growth Equit[y], Prudential Large Cap Growth).[8] Those changes replaced managers within the same large-growth strategy; they did not alter the LCG Fund's shortfall against its benchmark and its peers, which continued through every window (<u>Tables</u> <u>1.a</u> through <u>1.d</u>, *infra*).

45. The expense ratio of the LCG Fund is 0.34%.

46. As of January 31, 2026, the LCG Fund held approximately 95% of its assets in U.S. equities. It held approximately 48% of its assets in the technology sector, 13% in consumer cyclicals, 11% in financial services, 10% in communication services, and 11% in healthcare.[9]

47. The LCG Fund is in the "Large Growth" Morningstar category. Its Prospectus Benchmark is the Russell 1000 Growth TR USD ("Russell 1000 Growth").[10]

---

8 2020, 2022, and 2024 Forms 5500, Schedule H, line 4i (schedule of assets).

9 LCG Fund, Morningstar Investment Profile as of January 31, 2026.

10 Morningstar is a leading provider of investment research and is commonly relied upon by industry professionals. A Morningstar Category is assigned by placing funds into peer groups based on their portfolio statistics and compositions over the prior three years.

48. Importantly, the LCG Fund is the only actively managed large cap growth fund available in the Plan. The Plan's other domestic large-cap options are the Large Cap Value Fund and State Street index funds that track the Nasdaq-100 and the S&P 500. Participants who want to pursue an actively managed large cap growth investment strategy have no choice but to invest in the LCG Fund.

**III. The Small Cap Fund**

49. The Small Cap Fund is a diversified, multi-manager U.S. small cap equity fund that has been an investment option in the Plan since its inception in October 2009. The SC Fund "seeks long-term capital appreciation."[11]

50. The SC Fund is in the Morningstar "small blend" category. Small-blend portfolios favor U.S. firms at the smaller end of the market-capitalization range. Stocks in the bottom 10% of the capitalization of the U.S. equity market are defined as small cap. The blend style is assigned to portfolios where neither growth nor value characteristics predominate.

51. Like the LCG Fund, the SC Fund is also issued by Wells Fargo, but it is invested through five sleeves, four of them managed by sub-advisors and one a passive index fund. The State Street Russell Small Cap Index NL Cl K accounts for approximately 34% of the fund's assets, while the remaining assets are split nearly evenly among Hotchkis

---

[11] SC Fund, Morningstar Investment Profile as of January 31, 2026. Unless otherwise indicated, the SC Fund's portfolio and expense data in this Complaint are as of that date.

& Wiley Small Cap Div Val CL M, Great Gray Collective Invt Tr, Peregrine Small Value CIT-Founders Class, and William Blair Collective Invt Tr.

52. The SC Fund had approximately $1.54 billion in assets under management as of January 31, 2026, and its expense ratio is 0.42%.

53. According to its Morningstar Investment Profile, the SC Fund's assets were allocated 65.35% to U.S. equity, 1.12% to non-U.S. equity, 0.01% to fixed income, 0.65% to cash, and 32.87% to "Other." The "Other" allocation is the SC Fund's position in the State Street Russell Small Cap Index Non-Lending Series Fund Class K—a collective investment fund that seeks to track the Russell 2000 Index—which was the SC Fund's largest holding at 33.98% of assets. On a look-through basis, therefore, approximately 98% of the SC Fund's assets (65.35% directly and 32.87% through the index fund) were invested in U.S. equities.

54. The SC Fund is benchmarked to the Russell 2000 TR USD ("Russell 2000").

55. Importantly, the SC Fund is the only actively managed small cap fund available in the Plan. The Plan also offers the State Street Russell Small Cap Index Non-Lending Series Fund Class K, a passively managed collective investment fund that seeks to track the Russell 2000 Index at an expense ratio of 0.04%. Participants who want to pursue an actively managed small cap investment strategy have no choice but to invest in the SC Fund.

**IV. The State Street TDF Series**

56. Target date funds ("TDFs") are a type of fund designed to achieve certain investment results based on an investor's anticipated retirement date.

57. Target date funds "provide a diversified exposure to stocks, bonds, and cash for those investors who have a specific date in mind . . . for retirement. These portfolios aim to provide investors with an optimal level of return and risk, based solely on the target date. Management adjusts the allocation among asset classes to more-conservative mixes as the target date approaches, following a preset glide path.[12] A target-date portfolio is part of a series of funds offering multiple retirement dates to investors."[13]

58. A manager of a TDF may choose to include actively managed funds and/or passive funds within the TDF itself. Regardless of whether a TDF includes passively managed investments, all TDFs are actively managed as managers make active decisions when designing a TDF's asset allocation over time.

59. Since March 31, 2023, the Plan's target date options have been State Street's Target Retirement funds (the "State Street TDF Series," the "Series," or, in the tables, "SS TDF" or "SS"). From March 31, 2023 into 2026, the Plan held the Series through the State Street Target Retirement Non-Lending Series Funds Class A—units of collective investment funds sponsored by State Street Global Advisors Trust Company, as the Plan's Form 5500 filings report—which carry a negotiated expense (0.04% for the 2035 through

---

[12] A target date fund's "glide path" is the schedule by which it shifts its allocation from equities toward fixed income and cash as the target date approaches and, for a fund of the "through retirement" design, for a period after it. The glide paths of the State Street TDF Series and the Comparator TDFs are compared at ¶ 156, *infra*.

[13] State Street Target Retirement 2055 and 2060 Non-Lending Series Fund Class A, Morningstar Investment Profiles as of January 31, 2026 (Morningstar Category description).

2050 vintages and 0.041% for the 2055 and 2060 vintages) that was put in place on March 31, 2023, and is specific to the Plan; in 2026 the Class III units of the State Street Target Retirement Securities Lending Series Funds took their place. The Series is the third target date series the Plan has held since year-end 2020, as the Plan's schedules of assets show:[14]

The Plan's TDF Holdings at Year-End, 2020–2024 (the 2035–2060 vintages)
($ millions; totals computed from the unrounded schedule values)

| Vintage | Dec. 31, 2020 | Dec. 31, 2021 | Dec. 31, 2022 | Dec. 31, 2023 | Dec. 31, 2024 |
|---|---|---|---|---|---|
| **2035** | 961.5 | 1,085.5 | 909.0 | 1,077.0 | 1,238.1 |
| **2040** | 1,109.3 | 1,256.5 | 1,047.3 | 1,259.2 | 1,440.7 |
| **2045** | 740.2 | 868.4 | 748.3 | 945.4 | 1,140.1 |
| **2050** | 1,170.1 | 1,306.2 | 1,065.2 | 1,277.5 | 1,461.7 |
| **2055** | 435.0 | 509.1 | 433.0 | 544.6 | 652.4 |
| **2060** | 162.4 | 203.6 | 181.2 | 239.0 | 293.8 |
| **Six vintages** | 4,578.5 | 5,229.1 | 4,384.1 | 5,342.6 | 6,226.9 |
| **Series held** | Wells Fargo / State Street Target [year] CIT | State Street Cons Target Ret [year] NL P | State Street Cons Target Ret [year] NL P | State Street Target Ret [year] NL CL A | State Street Target Ret [year] NL CL A |

60. Through 2020, the Plan's target date funds were the Wells Fargo/State Street Target Date Collective Investment Trusts—proprietary funds that the Plan's 2020 Form 5500 lists as party-in-interest holdings and describes as "the age appropriate Wells Fargo/State Street Target Date CIT, an age-based series of target retirement date funds that serves as the Plan's qualified default investment alternative." Those trusts were among the investments challenged in the *Becker* Action, discussed at ¶ 226, *infra*.[15]

---

[14] 2020–2024 Forms 5500, Schedule H, line 4i; 2024 Form 5500, Schedule D, Part I; State Street Target Retirement 2035–2060 Non-Lending Series Fund Class A, Morningstar Investment Profiles as of January 31, 2026.

[15] 2020 Form 5500, Schedule H, line 4i (schedule of assets; the asterisk marks a party in interest), and Note 1(h) (Investment Options).

61. At year-end 2021 and year-end 2022 the Plan held a different State Street series—the State Street Conservative Target Retirement Non-Lending Series Funds (Class P), printed on the Plan's schedules of assets as "State Street Cons Target Ret [year] NL P."

62. On February 13, 2023, the Plan's recordkeeper notified participants that "[t]he 401(k) Plan's named fiduciary regularly reviews the investment funds offered in the 401(k) Plan and may make changes from time to time." The notice announced that "[o]n March 31, 2023, the new State Street Target Retirement Funds will replace the existing State Street Conservative Target Retirement Funds" over "a phased transition period beginning on March 15, 2023, and concluding on March 31, 2023." The notice directed participants to a fund-changes announcement whose "QDIA Information section serves as the QDIA notice and provides information about the 401(k) Plan's default investment options and how your 401(k) Plan contributions will be invested in certain circumstances if you do not make an investment election."[16]

63. The Plan's 2023 Form 5500, Schedule D, Part I, records the result. Every "Cons Target" trust is carried at a year-end value of zero, and the State Street Target Retirement Non-Lending Series Funds Class A carry the Plan's target date balances—approximately $5.34 billion in the six vintages at issue as of December 31, 2023, and

[16] Empower, "Announcing upcoming changes to the Wells Fargo & Company 401(k) Plan investment funds" (e-mail notice to Plan participants, February 13, 2023).

approximately $6.23 billion as of December 31, 2024.[17] Plaintiffs challenge both the selection of the State Street TDF Series in March 2023 and its retention thereafter.

64. The table below displays the approximate value of the assets invested in each of the State Street TDF Series vintages at issue as of December 31, 2024:

| Fund Name | Approximate Value |
|---|---|
| **2035 TDF** | $1.24 billion |
| **2040 TDF** | $1.44 billion |
| **2045 TDF** | $1.14 billion |
| **2050 TDF** | $1.46 billion |
| **2055 TDF** | $652 million |
| **2060 TDF** | $294 million |

65. From March 31, 2023 into 2026, the Plan held the State Street TDF Series through the State Street Target Retirement Non-Lending Series Funds Class A—units of collective investment funds whose expense reflects "a negotiated expense that was put in place on 3/31/2023 and is specific to the Wells Fargo 401(k) Plan," as the Series' Morningstar Investment Profiles state. Each vintage is a fund of funds that invests in State Street index funds and "seeks an investment return that approximates, as closely as practicable, before expenses, the performance of a custom benchmark index (the 'Index') over the long term."[18] That custom index measures how faithfully each vintage executes

---

[17] 2023 Form 5500, Schedule D, Part I, and Schedule H, line 4i; 2024 Form 5500, Schedule H, line 4i.

[18] State Street Target Retirement 2035–2060 Non-Lending Series Fund Class A, Morningstar Investment Profiles as of January 31, 2026 (Investment Strategy). The State Street Target Retirement 2035–2060 Securities Lending Series Fund Class III profiles as

State Street's allocation decisions, not how those decisions compare with the alternatives available to the Plan (¶ 143, *infra*).

66. Each vintage of the State Street TDF Series is benchmarked to the Morningstar Lifetime Mod Target Date TR USD Index of its target year (the "Morningstar Index" defined at ¶ 143, *infra*).

67. Importantly, State Street's Target Retirement funds are the only target date options in the Plan. Participants who want to pursue a target date investment strategy have no choice other than to invest in State Street's Target Retirement funds. What is more, contributions of participants who do not have an investment election on file are invested in the Plan's qualified default investment alternative, which the Plan's Form 5500 filings describe as "the age-appropriate target date fund"—that is, one of State Street's Target Retirement funds.

## V. Defendants Breached Their Fiduciary Duties Under ERISA

### A. Fiduciary Duties Under ERISA

#### 1. Fiduciary Duties of Prudence and Loyalty

68. Under ERISA, in addition to named fiduciaries, any other persons who perform fiduciary functions are treated as fiduciaries. *See* 29 U.S.C. § 1002(21)(A); 29 U.S.C. § 1102(a)(1).

---

of June 30, 2026 print the holdings of State Street index funds (Top 25 Holdings) and the Series' glide path, which the Class A profiles do not print.

69. ERISA imposes strict fiduciary duties of prudence and loyalty upon retirement plan fiduciaries. 29 U.S.C. § 1104(a). These duties apply to all fiduciary acts, including the Defendants' retention of investment options for the Plan. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use . . . ." 29 U.S.C. § 1104(a)(1)(B).

70. Importantly, the fact that participants may direct the investment of their contributions in a defined contribution plan account "does not serve to relieve a fiduciary from its duty to prudently select and monitor any . . . designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(2)(iv).

71. Fiduciaries have a "continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). Prudence requires a review at "regular intervals." *Id.*

72. "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If "fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (citing *Tibble*, 575 U.S. at 529–30).

73. When considering whether to retain an actively managed equity fund, a prudent fiduciary would evaluate the entire universe of similar funds available based on

qualitative and quantitative metrics, such as trailing 3, 5, and 10-year performance relative to peer benchmarks.

74. The comparisons that follow are made against meaningful benchmarks within the meaning of *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022), and *Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018). Each Challenged Fund is measured (i) against its Prospectus Benchmark; (ii) for the LCG Fund and the SC Fund, against an investable index fund of like composition; and (iii) against a group of peer funds that share its investment objective, style, asset allocation, sector exposures, risk profile, and institutional scale, as Sections V.B through V.D demonstrate characteristic by characteristic. Those peer funds are not cherry-picked outliers; they are mainstream funds offered by the largest managers in the defined contribution market, and each Challenged Fund trailed their average on every trailing window on which the claims against it rest (Tables 1.d, 2.c, and 3). There is "no one-size-fits-all approach"; whether a complaint pleads a meaningful benchmark "depends on the totality of the specific allegations." *Matousek*, 51 F.4th at 280–81.

2. Fiduciary Liability Under ERISA

75. Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have

> been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

3. Co-fiduciary Liability

76. ERISA also imposes co-fiduciary liability where a plan fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty of another fiduciary:

> 1. if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> 2. if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> 3. if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**B. The Large Cap Growth Fund Consistently Underperformed as Compared to Meaningful Benchmarks**

77. As detailed below, the LCG Fund has significantly and persistently underperformed its Prospectus Benchmark and four peer Comparator Funds on a trailing 3, 5, and 10-year basis, and on a cumulative basis over the period from 2018 through 2025, and it trails the average of its Morningstar peer category (the "Morningstar Large Growth Category average") over the trailing one-, three-, five-, and ten-year periods its Morningstar Investment Profile reports.

1. Meaningful Benchmarks to Compare the Investment Performance of the Large Cap Growth Fund

*a. Prospectus Benchmark and Morningstar Category*

78. The LCG Fund's Prospectus Benchmark is the Russell 1000 Growth, a widely recognized, industry-standard index that measures the performance of the large-cap growth segment of the U.S. equity market.

79. The LCG Fund's investment profile also reports the Morningstar Large Growth Category average—the mean return of every fund Morningstar classifies as Large Growth, regardless of quality, cost, or scale. That average is the least demanding comparison the Fund's own disclosures offer, and, as set forth in ¶ 105, the Fund trails even it over the trailing one-, three-, five-, and ten-year periods the profile reports.

*b. The LCG Comparator Funds*

80. The LCG Fund is directly comparable to other actively managed, U.S.-focused large-cap growth equity funds offered in defined contribution plans. Plaintiffs have identified the following four Comparator Funds as meaningful benchmarks against which to evaluate the LCG Fund's performance:

| **Fund** | **LCG Comparator Funds**[19] |
|---|---|
| **Large Cap Growth Fund** | American Century Growth R6 ("AGRDX") |
| | Loomis Sayles Growth Fund Class Y ("LSGRX") |
| | Janus Henderson Forty Fund Class I ("JCAPX") |
| | JPMorgan Large Cap Growth R6 ("JLGMX") |

19 The term "LCG Comparator Funds" as used herein refers collectively to: (1) AGRDX, (2) LSGRX, (3) JCAPX, and (4) JLGMX.

81. Each of the four LCG Comparator Funds shares with the LCG Fund the same investment category, portfolio construction approach, risk profile, and competitive universe. That comparability is not merely a matter of a shared Morningstar category and a shared benchmark. Rather, it is confirmed, characteristic by characteristic, by the funds' published portfolio data. As set forth below, the LCG Fund and the LCG Comparator Funds: (i) hold nearly identical total equity allocations; (ii) invest overwhelmingly in U.S. issuers; (iii) deploy their equity capital across the same economic sectors in similar proportions; (iv) occupy the same Large Growth investment category; and (v) carry comparable risk profiles.

82. The Vanguard Russell 1000 Growth Index Fund Institutional Shares ("VRGWX") is a mutual fund that seeks to track the Russell 1000 Growth at an expense ratio of 0.05%.[20] The Plan offers no large-cap option that tracks the Russell 1000 Growth (¶ 48, *supra*). VRGWX is shown in the vehicle table below and in Tables 1.c, 1.d, and 1.e as a structural benchmark—an investable form of the LCG Fund's benchmark. It is

[20] Vanguard Russell 1000 Growth Index Fund Institutional Shares, Morningstar Investment Profile page (performance data as of August 31, 2026; portfolio and risk data as of July 31, 2026). The page states that the fund "seeks to track the performance of the Russell 1000 Growth Index," names the Russell 1000 Growth as its calculation benchmark, and reports a beta of 1.00 and an R-squared of 100.00 against that benchmark, an inception date of December 6, 2010, and a net expense ratio of 0.05%. VRGWX's calendar-year returns for 2016 through 2025 are pleaded in Table 1.e.

presented as a measure of comparative performance only, and the comparator averages and loss estimates below use the LCG Comparator Funds.[21]

83. **Similar Equity Allocations.** Two funds are meaningfully comparable where they maintain similar allocations to equities. Equity allocation is the principal driver of a diversified fund's risk-and-return profile: funds with higher equity allocations are expected to generate higher long-term returns with greater short-term volatility, while funds holding meaningful fixed-income or cash positions trade return potential for stability. Funds with near-identical equity allocations are, by definition, taking on similar levels of market risk and targeting a similar risk-return tradeoff for their investors. As reflected in the table below, the LCG Fund and each of the LCG Comparator Funds allocate between approximately 98.8% and approximately 99.7% of assets to equities:

---

[21] Unless otherwise indicated, the LCG Fund's data in the tables in this Section are taken from its Morningstar Investment Profile as of January 31, 2026 (its three-year risk statistics from the profile as of June 30, 2026), and the LCG Comparator Funds' and VRGWX's data from the Morningstar Investment Profile pages published for each fund, whose portfolio and risk data are as of June 30, 2026 (JCAPX and VRGWX, July 31, 2026). VRGWX is excluded from every comparator average in this Section. The "LG Cat. Avg." column of the style-measures table is the Morningstar Large Growth category average as reported on the Fund's profile. "Comp. Avg." is the simple average of the four LCG Comparator Funds' figures and "Fund v. Avg." is the Fund's figure less that average, each computed from unrounded figures and rounded for display; columns may not sum to 100% due to rounding. Defendants possess, or can readily obtain, fully period-matched data for every fund.

Large Cap Growth Fund vs. LCG Comparator Funds: Asset Allocation

| Asset Class | LCG Fund | AGRDX | LSGRX | JCAPX | JLGMX | Comp. Avg. | Fund v. Avg. |
|---|---|---|---|---|---|---|---|
| **U.S. Equity** | 94.92 | 96.86 | 93.03 | 91.18 | 96.85 | 94.48 | +0.44 |
| **Non-U.S. Eq.** | 4.01 | 2.82 | 6.36 | 7.59 | 2.11 | 4.72 | -0.71 |
| **Total Equity** | 98.93 | 99.68 | 99.39 | 98.77 | 98.96 | 99.20 | -0.27 |
| **Fixed Income** | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | +0.04 |
| **Other** | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | +0.27 |
| **Cash** | 0.75 | 0.32 | 0.61 | 1.23 | 1.04 | 0.80 | -0.05 |

84. The LCG Fund's total equity allocation (approximately 98.9%) differs from the LCG Comparator Funds' average (approximately 99.2%) by less than one percentage point, and every fund in the group holds approximately 98.8% to approximately 99.7% of its assets in equities, with only incidental fixed-income and cash positions. Because of these similarities, the LCG Fund and the LCG Comparator Funds also share the same risks, including risks associated with the manager's selection of securities and investment style risk.

85. **Similar U.S.-Market Focus.** The LCG Fund and the LCG Comparator Funds likewise deploy those equity allocations overwhelmingly in the United States. The LCG Fund invests approximately 94.9% of its assets in U.S. equities, as does every LCG Comparator Fund (approximately 91.2% to approximately 96.9% U.S. equity; average approximately 94.5%). Stated otherwise, each of these funds is investing in the same market, in similar proportions, for the same purpose.

86. **Similar Sector Exposures.** Beyond asset-class allocation, comparability can be evaluated by examining the sectors in which the funds' equity portfolios are invested. Sector exposure reveals where each fund's equity capital is deployed across the economy;

funds with similar sector exposures are, by definition, exposed to similar industry-specific risks and opportunities, and their returns can be expected to respond similarly to sector-level economic events. As reflected below, the LCG Fund's equity is deployed across the same eleven Morningstar sectors as the LCG Comparator Funds', with technology the largest sector for every fund and eight of the eleven sectors within approximately two and one-half percentage points of the comparators' average (each LCG Comparator Fund's sector allocations are set out in Appendix A):

| Sector | LCG Fund | Comp. Avg. | Fund v. Avg. |
|---|---|---|---|
| **Technology** | 47.62 | 45.19 | +2.43 |
| **Consumer Cyclical** | 12.96 | 11.39 | +1.57 |
| **Healthcare** | 11.32 | 9.55 | +1.77 |
| **Financial Services** | 10.63 | 4.72 | +5.91 |
| **Communication Services** | 10.19 | 15.40 | -5.21 |
| **Industrials** | 4.41 | 10.69 | -6.28 |
| **Consumer Defensive** | 0.90 | 2.54 | -1.64 |
| **Basic Materials** | 0.72 | 0.15 | +0.57 |
| **Energy** | 0.54 | 0.31 | +0.23 |
| **Utilities** | 0.43 | 0.06 | +0.37 |
| **Real Estate** | 0.29 | 0.00 | +0.29 |

87. The data reveal a striking degree of sector-level consistency. Technology is the largest sector allocation for the LCG Fund and for every LCG Comparator Fund, and the LCG Fund's Technology weighting (47.62%) is within approximately 2.4 percentage points of the comparators' average. Eight of the eleven sectors differ from the comparator average by approximately two and one-half percentage points or less. The three that differ by more—an overweight in financial services (5.9 points) and underweights in industrials (6.3 points) and communication services (5.2 points)—are deliberate allocation tilts by the LCG Fund's managers whose performance consequences can and should be evaluated

against the LCG Comparator Funds. Each fund's top three sectors, moreover, account for a similar share of its portfolio (approximately 70.2% to approximately 78.1%). Stated otherwise, these funds are fishing in the same waters, and the performance differences between them reflect the skill with which each manager selects securities within those sectors, not differences in the segments of the economy in which they invest.

88. **The Same Investment Style.** The LCG Fund and every LCG Comparator Fund carry the same Morningstar analytical category, Large Growth—the category Morningstar defines as portfolios that "invest primarily in big U.S. companies that are projected to grow faster than other large-cap stocks," drawn from "the top 70% of the capitalization of the U.S. equity market."[22] Morningstar's holdings-based style analysis places four of the five funds in the same box. The LCG Fund's centroid sits in the Large Growth box,[23] as does the centroid of the Large Growth category itself, and the centroids of AGRDX, JCAPX, and JLGMX sit in the same box. LSGRX's centroid sat in the adjacent Large Blend box as of June 30, 2026, while Morningstar continues to classify the fund as Large Growth. The funds' published portfolio statistics corroborate the point. On each of the four valuation measures Morningstar reports—price/earnings, price/book, price/sales, and price/cash flow—the LCG Fund sits inside the range of the four LCG

---

22 LCG Fund, Morningstar Investment Profile as of January 31, 2026 (Morningstar Category).

23 Morningstar's style box classifies a fund along two axes—market capitalization (large, mid, small) and investment style (value, blend, growth)—from the weighted average characteristics of the fund's portfolio holdings. A fund's "centroid" is the point in the style box that represents that weighted average.

Comparator Funds, and its long-term earnings-growth estimate (12.88%) matches the low end of the comparators' range (12.88% to 17.55%):

Large Cap Growth Fund vs. LCG Comparator Funds: Portfolio Style Measures

| Measure | LCG | AGRDX | LSGRX | JCAPX | JLGMX | LG Cat. Avg. |
|---|---|---|---|---|---|---|
| Price/Earnings | 26.71 | 27.35 | 23.06 | 26.47 | 26.31 | 28.04 |
| Price/Book | 7.41 | 8.92 | 6.05 | 7.34 | 9.37 | 7.77 |
| Price/Sales | 5.56 | 5.93 | 5.05 | 5.07 | 7.23 | 5.56 |
| Price/Cash Flow | 18.91 | 19.09 | 15.65 | 18.58 | 22.08 | 20.04 |
| Dividend Yield % | 0.60 | 0.43 | — | 0.46 | — | 0.58 |
| Long-Term Earnings % | 12.88 | 15.96 | 12.88 | 17.55 | 17.25 | — |
| Historical Earnings % | 18.70 | 25.39 | 19.28 | 27.42 | 21.73 | 21.41 |

89. Funds with the same style classification face the same market dynamics. Performance differences between them cannot be attributed to differences in investment style; they reflect the quality of security selection and portfolio management—precisely what ERISA's duty of prudence requires fiduciaries to monitor.

90. **Comparable Risk Profiles.** A meaningful comparison also requires that the comparator funds carry comparable risk, so that performance differences can be attributed to the quality of management rather than to one fund simply taking more risk than another. Standard deviation is the foundational statistical measure of investment risk: it measures how much an investment's returns fluctuate around their average over a given period, and it is universally reported by fund rating services, including Morningstar, on a trailing three-year basis. Beta measures a fund's sensitivity to the movements of a reference index, and

R-squared ($R^2$) measures the percentage of a fund's movements that the index explains. The following sets out the funds' risk statistics:[24]

Large Cap Growth Fund vs. LCG Comparator Funds: Risk Metrics

| Fund | Standard Dev. (3-Yr) | Beta (3-Yr) | $R^2$ (3-Yr) | Volatility of Calendar-Year Returns (16–25) |
|---|---|---|---|---|
| **LCG Fund** | 16.51 | 0.99 | 97.49 | 23.37 |
| **AGRDX** | 16.73 | 0.98 | 98.24 | 22.62 |
| **LSGRX** | 17.55 | 0.98 | 88.29 | 22.67 |
| **JCAPX** | 17.52 | 0.95 | 94.34 | 22.90 |
| **JLGMX** | 17.12 | 0.98 | 93.86 | 24.45 |
| **Comp. Avg.** | 17.23 | 0.97 | 93.68 | 23.16 |

91. All five funds' three-year standard deviations fall within a band of 16.51 to 17.55—a spread of about one percentage point—with the LCG Fund at its low end. Every fund's beta sits near 1.0 (0.95 to 0.99) and every $R^2$ is high (88.29 to 98.24): each exposes its investors to the risk of the large-cap growth segment of the U.S. market. On the one measure computable for every fund on an identical basis—the volatility of the calendar-year returns pleaded in this Complaint—all five funds fall within a band of 22.62 to 24.45, a spread of under two points, and the LCG Fund (23.37) sits inside the comparators' range and within a quarter of a point of their average (23.16). Whichever measure is used, the LCG Comparator Funds did not achieve the returns pleaded in Tables 1.b and 1.c by taking on materially greater risk; their outperformance over the trailing windows pleaded below is attributable to the quality of investment management.

---

24 Three-year statistics as reported on each fund's Morningstar profile as of June 30, 2026 (JCAPX, July 31, 2026), each as computed by Morningstar against the calculation benchmark the profile names. The "Volatility of Calendar-Year Returns" column is the sample standard deviation of each fund's calendar-year returns for 2016 through 2025, as pleaded in Table 1.b, computed on an identical basis for every fund.

92. **Comparable Cost and Role.** The LCG Fund and the LCG Comparator Funds are all actively managed—each employs portfolio managers who exercise discretionary investment judgment in selecting securities rather than passively tracking an index—and each reports its performance against the Russell 1000 Growth, alone or beside the S&P 500.[25] They are institutional-scale vehicles of comparable cost, as the table below shows. The LCG Fund's expense ratio (0.34%) is below every comparator's (0.44% to 0.65%), so that its underperformance is net of a cost advantage. VRGWX, an investable form of the LCG Fund's benchmark, costs 0.05%:

Large Cap Growth Fund vs. LCG Comparator Funds:
Vehicle, Assets, Cost, and Benchmark

| Fund | Vehicle | Inception | Net Assets ($ millions)[26] | Expense Ratio | Morningstar Category | Benchmark |
|---|---|---|---|---|---|---|
| **LCG Fund** | Custom multi-manager CIT fund | October 8, 2009 | 4,040.4 | 0.34% | Large Growth | Russell 1000 Growth |
| **AGRDX** | Mutual fund (institutional) | July 26, 2013 | 1,154.9 | 0.48% | Large Growth | S&P 500; Russell 1000 Growth |
| **LSGRX** | Mutual fund (institutional) | May 16, 1991 | 13,954.3 | 0.65% | Large Growth | Russell 1000 Growth; S&P 500 |
| **JCAPX** | Mutual fund (institutional) | November 28, 2005 | 2,358.3 | 0.64% | Large Growth | Russell 1000 Growth; S&P 500 |
| **JLGMX** | Mutual fund (institutional) | November 30, 2010 | 67,510.1 | 0.44% | Large Growth | Russell 1000 Growth (performance); Russell 1000 (regulatory) |
| **VRGWX** | Index mutual fund (institutional) | December 6, 2010 | 8,370.4 | 0.05% | Large Growth | Russell 1000 Growth |

---

25 The Russell 1000 Growth is the calculation benchmark Morningstar applies to the LCG Fund, AGRDX, LSGRX, and JLGMX on their profiles, and the index against which each LCG Comparator Fund's fact sheet or fund page reports its returns. VRGWX seeks to track it (¶ 82, *supra*). Expense ratios are as reported on each fund's Morningstar profile.

26 Net assets are those of the share class shown, as reported on its Morningstar Investment Profile; for the LCG Fund and the SC Fund, which are collective investment funds without share classes, the figure is the fund's total assets. The same convention applies to the SC Comparator Funds table below.

93. That the LCG Fund is a custom multi-manager collective investment fund maintained for the Plan, while the LCG Comparator Funds are institutional share classes of publicly offered mutual funds, does not undermine the comparison. The comparability analysis set forth herein rests on the funds' actual portfolio compositions—their allocations, sector exposures, styles, and risk profiles—not on the legal wrapper through which the strategy is offered. Morningstar reports data for collective investment funds and mutual funds alike using identical metrics and classifications. The LCG Fund's Morningstar Investment Profile places it in the same Large Growth category, and reports the same portfolio statistics, as the profiles of the four LCG Comparator Funds. Nor does the LCG Fund's multi-manager construction distinguish it. Each of its five sleeves is a large-cap growth strategy run by an established institutional manager (¶ 44, *supra*), and the LCG Fund's underlying managers together produce a single Large Growth portfolio that a prudent fiduciary would measure against the Large Growth funds available in the marketplace. Plan fiduciaries routinely evaluate collective investment funds and mutual funds side by side when constructing plan lineups; indeed, the Plan itself pairs the LCG Fund with index funds pursuing overlapping segments of the large-cap market (¶ 48, *supra*). The Russell 1000 Growth, the benchmark the LCG Fund's profile designates, is presented in Table 1.a as a measure of comparative performance only; the comparator averages and loss estimates below use the LCG Comparator Funds.

94. In sum, the LCG Fund and the LCG Comparator Funds hold the same near-total equity allocations, invest in the same U.S. market, deploy capital across the same sectors in similar proportions, share the same Large Growth investment style, and carry

comparable risk profiles. Together with the Russell 1000 Growth and VRGWX, the LCG Comparator Funds are meaningful benchmarks against which the LCG Fund's performance—and Defendants' prudence in retaining it—can fairly be measured.

95. The LCG Comparator Funds are particularly appropriate comparators in the context of a defined contribution retirement plan because they occupy the same role within a plan's investment lineup—namely, actively managed large-cap growth equity options intended to provide participants with long-term capital appreciation. The LCG Comparator Funds are all widely available institutional share-class mutual funds that pursue materially similar mandates and invest in the same segment of the U.S. equity market as the LCG Fund. Accordingly, the LCG Comparator Funds represent meaningful peer funds against which a prudent fiduciary would evaluate whether the LCG Fund delivered competitive performance and value for the Plan's participants.

2. <u>The Large Cap Growth Fund Consistently Underperformed as Compared to the Meaningful Benchmarks</u>

96. As detailed below, the LCG Fund has significantly underperformed its Prospectus Benchmark and four peer LCG Comparator Funds on a trailing 3, 5, and 10-year basis and on a cumulative basis, and it trails the Morningstar Large Growth Category average over each of the trailing one-, three-, five-, and ten-year periods its Morningstar Investment Profile reports (¶ 105, *infra*).

97. The tables below show the Challenged Funds' annual returns, their performance over successive three-, five-, and ten-year periods, and their cumulative compounded returns. "Alpha" is the Challenged Fund's annual return less its benchmark's;

"Delta" is the Challenged Fund's annual return less the average annual return of the Comparator Funds (for each Challenged Fund, the LCG Comparator Funds, the SC Comparator Funds, or the Comparator TDFs identified below). The trailing Alpha and Delta rows compound those annual differences over the stated window. Tables 1.c, 2.b, and 4.b through 9.b separately compare the funds' cumulative compounded returns. Unless otherwise stated, figures are percentages, computed from unrounded values and rounded for display.

(a) In the annual tables, the comparator average represents an equal investment in each Comparator Fund, rebalanced annually. In the cumulative tables, "Comparator Average" is the average of the Comparator Funds' individual cumulative returns, representing equal investments held throughout the period. "Underperformance vs. Comparator" subtracts the comparator's cumulative return from the Challenged Fund's. A positive figure means the Challenged Fund earned more. These cumulative-return differences are distinct from the compounded annual differences in the trailing rows.

(b) Tables 1.d, 2.c, and 3 apply the same trailing convention to each comparator. Tables 1.d and 2.c count, for each comparator, the available three-, five-, and ten-year windows in which the compounded annual difference was negative; Table 3 counts those in which it was positive, and also states the count for windows ending 2023 through 2025. Table 10 applies the loss illustrations' method to the Plan's audited year-end 2024 balances; the individual illustrations use the rounded balances they state.

98. The LCG Fund has underperformed its Prospectus Benchmark and the average of the LCG Comparator Funds on every trailing three-year, five-year, and ten-year window computable from the returns pleaded below—every window ending 2018 through 2025.

99. Table 1.a below illustrates the LCG Fund's performance as compared to the Prospectus Benchmark (Russell 1000 Gr.) based on: (i) yearly returns for the years 2016–2025; (ii) trailing three-year returns for the years 2018–2025; (iii) trailing five-year returns for the years 2020–2025; and (iv) trailing ten-year returns for 2025:

Table 1.a
**Large Cap Growth Fund**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. Prospectus Benchmark

| Fund / Benchmark | Annual Performance | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **LCG Fund** | 1.58 | 29.67 | -0.52 | 30.50 | 38.90 | 19.12 | -34.85 | 43.78 | 27.50 | 11.80 |
| Russell 1000 Gr. | 7.08 | 30.21 | -1.51 | 36.39 | 38.49 | 27.60 | -29.14 | 42.68 | 33.36 | 18.56 |
| *Alpha* | -5.50 | -0.54 | 0.99 | -5.89 | 0.41 | -8.48 | -5.71 | 1.10 | -5.86 | -6.76 |
| **Trailing 3** | - | - | -5.08 | -5.47 | -4.57 | -13.52 | -13.35 | -12.76 | -10.26 | -11.26 |
| **Trailing 5** | - | - | - | - | -10.30 | -13.13 | -17.65 | -17.56 | -17.53 | -23.42 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -31.31 |

100. Table 1.b below illustrates the LCG Fund's performance as compared to the LCG Comparator Funds based on: (i) yearly returns for the years 2016–2025; (ii) trailing three-year returns for the years 2018–2025; (iii) trailing five-year returns for the years 2020–2025; and (iv) trailing ten-year returns for the year 2025:

Table 1.b
**Large Cap Growth Fund**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. LCG Comparator Funds

| Fund | Annual Performance | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **LCG Fund** | 1.58 | 29.67 | -0.52 | 30.50 | 38.90 | 19.12 | -34.85 | 43.78 | 27.50 | 11.80 |
| AGRDX | 4.49 | 30.58 | -1.30 | 35.90 | 35.67 | 27.93 | -31.20 | 43.78 | 26.67 | 15.61 |
| LSGRX | 5.87 | 32.64 | -2.48 | 31.72 | 31.77 | 18.65 | -27.64 | 51.42 | 34.38 | 14.90 |
| JCAPX | 2.37 | 29.60 | 1.50 | 36.86 | 39.21 | 22.98 | -33.54 | 39.91 | 28.27 | 18.35 |
| JLGMX | -1.74 | 38.37 | 0.57 | 39.39 | 56.42 | 18.79 | -25.21 | 34.95 | 34.17 | 14.40 |
| *Delta* | -1.17 | -3.13 | -0.09 | -5.47 | -1.87 | -2.97 | -5.45 | 1.27 | -3.37 | -4.02 |
| **Trailing 3** | - | - | -4.35 | -8.51 | -7.32 | -9.99 | -9.97 | -7.10 | -7.49 | -6.08 |
| **Trailing 5** | - | - | - | - | -11.27 | -12.88 | -14.97 | -13.82 | -11.91 | -13.84 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -23.54 |

101. Table 1.c below illustrates the LCG's cumulative compounded performance as compared to the LCG Comparator Funds, the Prospectus Benchmark, and VRGWX:

Table 1.c
**Large Cap Growth Fund**
Cumulative Compounded Performance vs. the Comparator Funds, the Prospectus Benchmark, and VRGWX

| Fund / Benchmark | Cumulative Compounded Performance 2018–2025 | |
|---|---|---|
| | **Cumulative Compounded Performance** | **Underperformance vs. Comparator** |
| **LCG Fund** | 186.81% | N/A |
| AGRDX | 237.25% | -50.44% |
| LSGRX | 239.76% | -52.94% |
| JCAPX | 235.70% | -48.89% |
| JLGMX | 303.52% | -116.71% |
| *Comparator Average* | 254.06% | -67.24% |
| Russell 1000 Gr. | 279.47% | -92.65% |
| VRGWX | 277.63% | -90.82% |

102. As demonstrated above, the LCG Fund dramatically and consistently underperformed its Prospectus Benchmark and the four LCG Comparator Funds, causing substantial losses to the Plan's participants.

103. Table 1.d below states the record comparator by comparator: (i) for each LCG Comparator Fund, their average, and each benchmark, the compounded difference between the Fund's returns and the comparison's over the trailing three-, five-, and ten-year windows ending December 31, 2025; (ii) the number of the fifteen trailing windows computable from the returns pleaded in Tables 1.a and 1.b (and, for VRGWX, Table 1.e, *infra*)—the three-year windows ending 2018 through 2025, the five-year windows ending 2020 through 2025, and the ten-year window ending 2025—on which the Fund underperformed the comparator or benchmark. On the compounded basis stated in ¶ 97, *supra*, AGRDX, JLGMX, the average of the LCG Comparator Funds, the Russell 1000 Growth, and VRGWX outperformed the LCG Fund on all fifteen windows, JCAPX on fourteen of the fifteen, and LSGRX on ten of the fifteen and on every window ending 2023 or later. At the start of the Class Period, on the windows ending December 31, 2020, the Russell 1000 Growth, VRGWX, the average of the LCG Comparator Funds, and three of the four LCG Comparator Funds (AGRDX, JCAPX, and JLGMX) were already ahead of the Fund on both the three- and five-year windows. As of December 31, 2025, every LCG Comparator Fund, their average, and both benchmarks are ahead of the LCG Fund on every trailing window. A fund that trails its Prospectus Benchmark, the average of its peers, and

two of its four peers on every standard monitoring window across eight consecutive year-ends is chronically underperforming.

Table 1.d
**Large Cap Growth Fund**
Trailing Compounded Differentials as of December 31, 2025, and Windows Underperformed vs. LCG Comparator Funds and Benchmark

| Comparator / Benchmark | Trailing 3 (2025) | Trailing 5 (2025) | Trailing 10 (2025) | Trailing windows underperformed (18–25) |
|---|---|---|---|---|
| AGRDX | -3.01 | -14.78 | -19.31 | 15 of 15 |
| LSGRX | -16.66 | -22.31 | -22.15 | 10 of 15 |
| JCAPX | -3.68 | -8.61 | -17.02 | 14 of 15 |
| JLGMX | -1.07 | -10.31 | -37.12 | 15 of 15 |
| Comparator Average | -6.08 | -13.84 | -23.54 | 15 of 15 |
| Russell 1000 Growth | -11.26 | -23.42 | -31.31 | 15 of 15 |
| VRGWX | -11.06 | -23.16 | -30.78 | 15 of 15 |

104. Table 1.e states VRGWX's annual returns beside the Fund's, the annual Alpha, and the compounded trailing Alpha over each window, computed as ¶ 97 describes:

Table 1.e
**Large Cap Growth Fund**
Annual Performance and 3-, 5-, and 10-Year Compounded Trailing Alpha vs. VRGWX, an Investable Form of the Prospectus Benchmark

| **Fund** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
|---|---|---|---|---|---|---|---|---|---|---|
| **LCG Fund** | 1.58 | 29.67 | -0.52 | 30.50 | 38.90 | 19.12 | -34.85 | 43.78 | 27.50 | 11.80 |
| VRGWX | 7.02 | 30.12 | -1.58 | 36.30 | 38.38 | 27.52 | -29.17 | 42.65 | 33.25 | 18.49 |
| Alpha | -5.44 | -0.45 | 1.06 | -5.80 | 0.52 | -8.40 | -5.68 | 1.13 | -5.75 | -6.69 |
| **Trailing 3** | - | - | -4.87 | -5.23 | -4.31 | -13.26 | -13.15 | -12.63 | -10.10 | -11.06 |
| **Trailing 5** | - | - | - | - | -9.92 | -12.74 | -17.32 | -17.27 | -17.22 | -23.16 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -30.78 |

105. The Fund's disclosures report the same record. Its Morningstar Investment Profile as of January 31, 2026—available to participants through the Plan's recordkeeper—reports the Fund trailing the Russell 1000 Growth over the trailing one-year (5.10% against 14.50%), three-year (22.01% against 27.05%), five-year (9.44% against 15.14%), and ten-

year (14.61% against 18.63%) periods. It reports the Fund trailing the Morningstar Large Growth Category average over every one of those periods as well (11.81%, 23.81%, 11.33%, and 16.03%, respectively).[27]

106. A conservative illustration demonstrates the scale of the losses. As of December 31, 2024, the assets in the LCG Fund had an approximate value of $4.14 billion. Assuming, for illustrative purposes only, that the approximately $4.14 billion in assets reflects compound growth on a single starting principal, and given that the LCG Fund produced cumulative compounded growth of 186.81% from 2018 through 2025, the implied underlying principal at the start of 2018 would be approximately $1.44 billion ($4.14 billion divided by 2.8681[28]). Had that same amount instead been invested across the LCG Comparator Funds, which produced average cumulative compounded growth of 254.06% over the same period (*see* Table 1.c, "Comparator Average"), it would have grown to approximately $5.11 billion. This illustration suggests that Plan participants lost approximately $970.7 million as a result of Defendants' decision to retain the LCG Fund rather than a prudent alternative. That illustration measures the full cost of the retention decision from the first year of the Fund's persistent underperformance. The losses Plaintiffs

---

[27] LCG Fund, Morningstar Investment Profile as of January 31, 2026, Trailing Returns (annualized).

[28] The divisor of 2.8681 represents each dollar of starting principal ($1.00) plus the 186.81% cumulative compounded growth ($1.8681). The same methodology is applied throughout this Complaint.

seek to recover, measured from the first full calendar year of the Class Period, are set out in ¶¶ 216–220 and Table 10 below.

107. The foregoing return, trailing 3, 5, and 10-year return and cumulative performance information is information Defendants would have had available had they conducted a simple analysis evaluating the LCG Fund and compared its performance to its Prospectus Benchmark, the Morningstar Large Growth Category average, or any of the LCG Comparator Funds.

108. A prudent fiduciary monitoring the LCG Fund's performance would have compared the fund's returns to returns of the fund's stated Prospectus Benchmark, and one or more of the LCG Comparator Funds identified in Table 1.b and Table 1.c.

109. When considering whether to retain a large cap growth fund in a plan, a prudent fiduciary would evaluate the fund's risk and return characteristics as compared to the entire universe of comparable available funds based on qualitative and quantitative metrics. A prudent fiduciary could not have reasonably concluded that retention of the LCG Fund was appropriate for the Plan.

### C. The Small Cap Fund Consistently Underperformed as Compared to Meaningful Benchmarks

110. As detailed below, the SC Fund has significantly underperformed four peer Comparator Funds on a trailing three- and five-year basis, on a trailing ten-year basis for the three with ten-year records, and on a cumulative basis from 2021 through 2025, and it has trailed its Prospectus Benchmark on every trailing window ending 2024 and 2025.

1. Meaningful Benchmarks to Compare the Investment Performance of the Small Cap Fund

*a. Prospectus Benchmark*

111. The SC Fund's Investment Profile compares its performance to that of a style-specific benchmark, the Russell 2000, a widely recognized, industry-standard index that measures the performance of the small-cap segment of the U.S. equity market.

*b. The SC Comparator Funds*

112. The SC Fund is directly comparable to other actively managed, U.S.-focused small-cap equity funds offered in defined contribution plans, including the following four Comparator Funds identified by Plaintiffs:

| **Fund** | **SC Comparator Funds**[29] |
|---|---|
| **Small Cap Fund** | DFA US Small Cap I ("DFSTX") |
| | Nuveen Quant Small Cap Equity R6 ("TISEX") |
| | Federated Hermes MDT Small Cap Core Fund Class R6 ("QLSCX") |
| | Fidelity Advisor Small Cap Fund - Class I ("FSCIX") |

113. Each of the four SC Comparator Funds shares with the SC Fund the same investment category, portfolio construction approach, risk profile, and competitive universe. That comparability is confirmed, characteristic by characteristic, by the funds' published portfolio data.[30] As set forth below, the SC Fund and the SC Comparator Funds:

---

[29] The term "SC Comparator Funds" as used herein refers collectively to: (1) DFSTX, (2) TISEX, (3) QLSCX, and (4) FSCIX.

[30] Unless otherwise indicated, the SC Fund's data in the tables in this Section are taken from its Morningstar Investment Profile as of January 31, 2026 (its three-year risk statistics

(i) hold similar total equity allocations on a look-through basis; (ii) invest overwhelmingly in U.S. issuers; (iii) deploy their equity capital across the same economic sectors in similar proportions; (iv) occupy the same Small Blend investment category; and (v) carry comparable risk profiles. The Plan's State Street Russell Small Cap Index NL Cl K—the index fund that sits beside the SC Fund in the Plan's lineup and inside it as the Fund's largest sleeve (¶¶ 51, 53, 55, *supra*)—is shown in each table as a structural benchmark, presented as a measure of comparative performance only and excluded from every average and every damages figure in this Complaint. That index fund seeks to track the Russell 2000, the SC Fund's Prospectus Benchmark (¶¶ 55, 111, *supra*), and its Morningstar profile reports a beta of 1.00 and an $R^2$ of 100.00 against that index (the risk table following ¶ 123, *infra*). The Russell 2000 figures in Tables 2.b and 2.c and in ¶¶ 126, 128, and 133, *infra*, therefore measure the same alternative that the tables in this Section show as the structural benchmark.

---

from the profile as of June 30, 2026), and the SC Comparator Funds' and the State Street Russell Small Cap Index NL Cl K's data from the Morningstar Investment Profile pages published for each fund and, for the index fund's expense ratio, the Plan's Investment Options at a Glance sheet. The comparators' portfolio and risk data are as of June 30, 2026 (the index fund, July 31, 2026). The index fund is excluded from every comparator average. The "Small Blend Cat. Avg." column of the style-measures table is the Morningstar Small Blend category average as reported on the Fund's profile. "Comp. Avg." is the simple average of the four SC Comparator Funds' figures and "Fund v. Avg." is the Fund's figure less that average, each computed from unrounded figures and rounded for display; columns may not sum to 100% due to rounding. QLSCX was launched June 29, 2016, and does not report a calendar-year return for 2016. As such, the 2016 comparator average is the average of the other three SC Comparator Funds, and no ten-year window is computed for QLSCX. Defendants possess, or can readily obtain, fully period-matched data for every fund.

114. **Similar Equity Allocations.** Two funds are meaningfully comparable where they maintain similar allocations to equities, because equity allocation is the principal driver of a diversified fund's risk-and-return profile. As its Morningstar profile reports the Fund's holdings, the SC Fund shows 65.35% in U.S. equity and 32.87% in "Other"—the "Other" being the Fund's 33.98% position in the State Street Russell Small Cap Index NL Cl K, a fund that itself holds U.S. small-cap equities (¶ 53, *supra*). On a look-through basis, the SC Fund holds approximately 98.2% of its assets in U.S. equities—the same posture as the SC Comparator Funds, each of which holds approximately 89.8% or more of its assets in equities:

Small Cap Fund vs. SC Comparator Funds: Asset Allocation

| **Asset Class** | **SC Fund** | **SC Fund (index sleeve)** | **DFSTX** | **TISEX** | **QLSCX** | **FSCIX** | **Comp. Avg.** | **Fund v. Avg.** | **SS Russell SC Index** |
|---|---|---|---|---|---|---|---|---|---|
| U.S. Equity | 65.35 | 98.22 | 88.42 | 96.71 | 94.06 | 84.77 | 90.99 | +7.23 | 96.87 |
| Non-U.S. Eq. | 1.12 | 1.12 | 1.38 | 2.78 | 1.75 | 6.67 | 3.15 | -2.03 | 2.40 |
| Total Equity | 66.47 | 99.34 | 89.80 | 99.49 | 95.81 | 91.44 | 94.14 | +5.21 | 99.27 |
| Fixed Income | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | +0.01 | 0.65 |
| Other | 32.87 | 0.00 | 0.01 | 0.00 | 4.19 | 0.00 | 1.05 | -1.05 | 0.01 |
| Cash | 0.65 | 0.65 | 10.20 | 0.51 | 0.00 | 8.57 | 4.82 | -4.17 | 0.07 |

115. On a look-through basis, the SC Fund's total equity allocation (approximately 99.3%) sits at the top end of a range that runs from approximately 89.8% to approximately 99.5%, 5.2 percentage points above the SC Comparator Funds' average (approximately 94.1%). The difference is the cash that two of the comparators hold (10.20% and 8.57%), not a difference in the market in which the funds invest. Because of

these similarities, the SC Fund and the SC Comparator Funds also share the same risks, including risks associated with the manager's selection of securities and investment style.

116. **Similar U.S.-Market Focus.** The SC Fund and the SC Comparator Funds likewise deploy those equity allocations overwhelmingly in the United States. Each fund invests approximately 84.8% or more of its assets in U.S. equities (the SC Fund, on a look-through basis, approximately 98.2%), and non-U.S. exposure is incidental for every fund in the group. Stated otherwise, these funds are investing in the same market, in similar proportions, for the same purpose.

117. **Similar Sector Exposures.** Beyond asset-class allocation, comparability can be evaluated by examining the sectors in which the funds' equity portfolios are invested. Funds with similar sector exposures are, by definition, exposed to similar industry-specific risks and opportunities. As reflected below, the SC Fund and the SC Comparator Funds deploy their equity across the same eleven Morningstar sectors, with the same four sectors—financial services, industrials, healthcare, and technology—together accounting for roughly three-fifths or more of each fund's equity (each SC Comparator Fund's sector allocations are set out in Appendix A):

Small Cap Fund vs. SC Comparator Funds: Sector Allocations

| Sector | SC Fund | Comp. Avg. | Fund v. Avg. | SS Russell SC Index |
|---|---|---|---|---|
| **Financial Services** | 23.29 | 18.10 | +5.19 | 18.57 |
| **Industrials** | 13.90 | 17.73 | -3.83 | 13.53 |
| **Healthcare** | 12.44 | 17.08 | -4.64 | 20.07 |
| **Consumer Cyclical** | 12.36 | 10.40 | +1.96 | 9.23 |
| **Technology** | 10.81 | 16.42 | -5.61 | 13.82 |
| **Real Estate** | 7.72 | 4.33 | +3.39 | 6.84 |
| **Energy** | 6.60 | 4.46 | +2.15 | 6.01 |
| **Basic Materials** | 4.68 | 4.64 | +0.05 | 4.21 |
| **Utilities** | 3.70 | 2.18 | +1.53 | 2.79 |
| **Consumer Defensive** | 2.53 | 2.90 | -0.37 | 2.73 |
| **Communication Services** | 1.96 | 1.80 | +0.17 | 2.22 |

118. Financial services, industrials, healthcare, and technology together account for approximately 60.4% of the SC Fund's equity and approximately 66.9% to approximately 72.3% of each SC Comparator Fund's—and approximately 66.0% of the Plan's Russell 2000 index fund's. Five of the eleven sectors sit within two percentage points of the comparator average, and no sector differs from it by as much as six points. The differences that exist are a value tilt. The SC Fund is overweight financial services (5.2 points), real estate (3.4 points), and energy (2.1 points), and underweight technology (5.6 points), healthcare (4.6 points), and industrials (3.8 points). Those are the allocation choices of the Fund's active managers—choices whose performance consequences are precisely what comparison against peer funds is designed to measure. The Fund's portfolio is, moreover, the less concentrated one: its top three sectors account for approximately 49.6% of its equity, against approximately 52.8% to approximately 56.7% for the comparators. Stated otherwise, these funds are again fishing in the same waters, and the

performance differences between them reflect the skill with which each manager selects securities within those sectors.

119. **The Same Investment Category.** Morningstar assigns the SC Fund, every SC Comparator Fund, and the Plan's Russell 2000 index fund to the same analytical category, Small Blend—portfolios that invest in small U.S. companies without a predominant growth or value orientation—based on the composition of each fund's portfolio over the prior three years.[31] The SC Fund is a blend by construction: throughout the Class Period, it has held approximately one-third of its assets in the State Street Russell Small Cap Index sleeve, which holds the Russell 2000 across both its growth and its value constituents, around a set of actively managed sleeves (¶ 51, *supra*). Morningstar's point-in-time style measure for the Fund's visible holdings—the actively managed two-thirds of the portfolio outside the index sleeve, a position the profile reports as "Other" rather than as underlying equities—reads Small Value on the Fund's January 31, 2026 profile. That reading reflects the current positioning of the Fund's value managers within a portfolio whose category, benchmark, construction, and index core are those of a small-cap blend fund. The SC Fund's profile reports its investment style as "Small Value" and FSCIX's as "Small Growth"; all five funds sit in Morningstar's Small Blend category. The funds' published portfolio statistics corroborate the point. On the price/earnings, price/book, and price/sales measures the SC Fund's visible holdings sit below the range of the four SC

---

[31] SC Fund, Morningstar Investment Profile as of January 31, 2026, and the SC Comparator Funds' and the index fund's Morningstar Investment Profiles (Morningstar Category).

Comparator Funds, whose measures span the category from DFSTX and QLSCX at the value end to FSCIX at the growth end, with the Plan's Russell 2000 index fund near the category average:

<u>Small Cap Fund vs. SC Comparator Funds: Portfolio Style Measures</u>

| Measure | SC Fund | DFSTX | TISEX | QLSCX | FSCIX | Small Blend Cat. Avg. | SS Russell SC Index |
|---|---|---|---|---|---|---|---|
| Price/Earnings | 14.02 | 15.49 | 16.96 | 15.11 | 18.24 | 15.47 | 15.77 |
| Price/Book | 1.50 | 2.10 | 2.28 | 2.14 | 2.68 | 2.01 | 1.97 |
| Price/Sales | 0.95 | 1.20 | 1.55 | 1.07 | 1.53 | 1.32 | 1.21 |
| Price/Cash Flow | 7.21 | 8.86 | 9.16 | 7.02 | 11.47 | 8.95 | 8.20 |
| Dividend Yield % | 1.94 | — | — | — | — | 1.33 | 1.32 |
| Long-Term Earnings % | 9.59 | 12.00 | 11.76 | 12.10 | 11.00 | — | 11.87 |
| Historical Earnings % | -16.35 | -0.57 | 2.60 | 2.60 | 3.97 | 0.56 | -2.92 |

120. Funds within the same category, investing in stocks of similar size across the same growth-and-value spectrum, face the same market dynamics; performance differences between them reflect the quality of security selection and portfolio management. A comparator suite that spans the category controls for style: the Fund trailed the comparators at the value end of the category and at its growth end alike over the cumulative period pleaded in <u>Table 2.b</u> and on every trailing window ending 2023 or later (¶ 133, *infra*).

121. **Comparable Cost and Role.** The SC Fund and the SC Comparator Funds are all actively managed small-cap funds, and they are institutional-scale vehicles of comparable cost. The SC Fund's expense ratio (0.42%) sits inside the comparators' range (0.27% to 0.95%), and the Plan's Russell 2000 index fund costs 0.04%, as the table below

shows. Every fund in the group, moreover, is measured against the Russell 2000, as its prospectus benchmark or as a stated additional or secondary index.[32]

Small Cap Fund vs. SC Comparator Funds:
Vehicle, Assets, Cost, and Benchmark

| Fund | Vehicle | Inception | Net Assets ($ millions) | Expense Ratio | Morningstar Category | Benchmark |
|---|---|---|---|---|---|---|
| **SC Fund** | Custom multi-manager CIT | October 8, 2009 | 1,538.5 | 0.42% | Small Blend | Russell 2000 |
| DFSTX | Mutual fund (institutional) | March 19, 1992 | 19,721.3 | 0.27% | Small Blend | Russell 2000 |
| TISEX | Mutual fund (institutional) | October 1, 2002 | 2,850.5 | 0.40% | Small Blend | Russell 2000 |
| QLSCX | Mutual fund (institutional) | June 29, 2016 | 324.1 | 0.88% | Small Blend | Russell 2000 |
| FSCIX | Mutual fund (institutional) | September 9, 1998 | 666.1 | 0.95% | Small Blend | Russell 2000 |
| SS Russell SC Index | Index collective investment fund | March 16, 2018 | 935.0 | 0.04% | Small Blend | Russell 2000 |

122. That the SC Fund is a custom multi-manager collective investment fund maintained for the Plan, while the SC Comparator Funds are institutional share classes of publicly offered mutual funds, does not undermine the comparison. Instead, that difference makes the comparison more instructive. The comparability analysis rests on the funds' actual portfolio compositions, not their management labels or legal wrappers, and Morningstar reports data for collective investment funds and mutual funds alike using

[32] The SC Fund's Prospectus Benchmark is the Russell 2000 (¶ 111, *supra*). Each SC Comparator Fund's current prospectus measures the fund against the Russell 2000: DFSTX's and FSCIX's performance tables list it first, and FSCIX's management fee is adjusted up or down by as much as 0.20% "based on the performance of the fund or a designated class of the fund relative to that of the Russell 2000 Index"; TISEX's summary prospectus calls it "the Fund's benchmark index"; and QLSCX's prospectus compares the fund to it as a secondary index "to show how the Fund's performance compares with the returns of an index with similar investments." Expense ratios are as reported on each fund's Morningstar profile (the index fund's, on the Plan's Investment Options at a Glance sheet).

identical metrics and classifications. The SC Fund's Morningstar Investment Profile places it in the same Small Blend category as the four SC Comparator Funds. The Fund's construction is itself a series of fiduciary decisions—the selection, termination, and re-weighting of its active sleeves between 2021 and 2025 (¶ 51, *supra*; ¶ 136, *infra*)—around an index core that the Plan also offers to participants directly, at an expense ratio of 0.04%, as the State Street Russell Small Cap Index NL Cl K (¶ 55, *supra*). Comparing the SC Fund to that index fund is the equivalent of comparing the Fund to an investable form of its benchmark; comparing it to the SC Comparator Funds measures what prudent active management of the same mandate delivered over the same period. The SC Comparator Funds are particularly appropriate comparators in the context of a defined contribution retirement plan because they occupy the same role within a plan's investment lineup—actively managed small-cap equity options intended to provide participants with long-term capital appreciation—and they are widely available institutional share-class mutual funds that pursue materially similar mandates and invest in the same segment of the U.S. equity market as the SC Fund. Accordingly, the SC Comparator Funds represent meaningful peer funds against which a prudent fiduciary would evaluate whether the SC Fund delivered competitive performance and value for the Plan's participants.

123. **Comparable Risk Profiles.** A meaningful comparison also requires that the comparator funds carry comparable risk, so that performance differences can be attributed to the quality of management rather than to one fund simply taking more risk than another. Standard deviation is the foundational statistical measure of investment risk; the Sharpe ratio measures the return a fund delivered for each unit of risk it took; beta measures a

fund's sensitivity to the movements of a reference index; and R-squared ($R^2$) measures the percentage of a fund's movements that the index explains. The following sets out the funds' risk statistics:[33]

Small Cap Fund vs. SC Comparator Funds: Risk Metrics

| Fund | Standard Dev. (3-Yr) | Sharpe Ratio (3-Yr) | Beta (3-Yr) | $R^2$ (3-Yr) | Volatility of Calendar-Year Returns (16–25) |
|---|---|---|---|---|---|
| **SC Fund** | 18.84 | 0.63 | 0.94 | 98.38 | 14.85 |
| DFSTX | 17.75 | 0.56 | 0.98 | 98.02 | 14.51 |
| TISEX | 19.27 | 0.74 | 0.95 | 97.42 | 14.12 |
| QLSCX | 20.09 | 0.69 | 0.99 | 96.57 | 16.83 |
| FSCIX | 18.12 | 0.66 | 0.98 | 93.95 | 17.56 |
| Comp. Avg. | 18.81 | 0.66 | 0.98 | 96.49 | 15.75 |
| SS Russell SC Index | 19.97 | 0.57 | 1.00 | 100.00 | — |

124. The SC Fund's three-year standard deviation (18.84) sits inside the SC Comparator Funds' band (17.75 to 20.09) and above their average (18.81); its Sharpe ratio (0.63) sits inside their band (0.56 to 0.74) and below their average (0.66). Every fund's beta is at or near 1.0 (0.94 to 0.99) and every $R^2$ is high (93.95 to 98.38): each exposes its investors to the risk of the U.S. small-cap market, as does the Plan's Russell 2000 index fund (standard deviation 19.97; Sharpe ratio 0.57). On the volatility of the calendar-year returns pleaded in this Complaint, the SC Fund (14.85) sits inside the comparators' range (14.12 to 17.56), and it does so whether QLSCX is measured over its shorter record or

---

[33] Three-year statistics as reported on each fund's Morningstar profile as of June 30, 2026 (July 31, 2026 for the State Street Russell Small Cap Index NL Cl K), each as computed by Morningstar against the calculation benchmark the profile names. The "Volatility of Calendar-Year Returns" column is the sample standard deviation of each fund's calendar-year returns as pleaded in Table 2.a—for 2016 through 2025 for the SC Fund, DFSTX, TISEX, and FSCIX, and for 2017 through 2025 for QLSCX, whose Class R6 reports no 2016 return.

every fund is measured over the same nine years. The SC Comparator Funds did not achieve the returns pleaded in Tables 2.a and 2.b by taking on greater risk; the SC Fund took the same risk and delivered less return for it.

125. In sum, the SC Fund and the SC Comparator Funds hold the same near-total equity allocations, invest in the same U.S. small-cap market, deploy capital across the same sectors in similar proportions, share the same Small Blend category, and carry comparable risk profiles. Together with the Russell 2000 and the Plan's Russell 2000 index fund, the SC Comparator Funds are meaningful benchmarks against which the SC Fund's performance—and Defendants' prudence in retaining it—can fairly be measured.

2. The Small Cap Fund Consistently Underperformed as Compared to the Meaningful Benchmarks

126. As detailed below, the SC Fund's record turned by year-end 2022. On the trailing three-year window ending December 31, 2022, the Fund trailed every one of the four SC Comparator Funds and their average, and on the trailing five-year window ending December 31, 2022, it trailed the comparator average and two of the four. On every trailing three-, five-, and ten-year window computable from the pleaded returns and ending 2023, 2024, or 2025, the Fund trailed every SC Comparator Fund and their average. It trailed its benchmark, the Russell 2000, on the three-year window ending 2023 and on every window ending 2024 and 2025. A prudent fiduciary would have removed the Fund no later than year-end 2022, the first year-end at which it trailed the average of the SC Comparator Funds on both the three- and five-year windows. Defendants instead retained it, replacing its active sleeves one by one while leaving the index sleeve in place.

127. The SC Fund has underperformed the average of the SC Comparator Funds on every trailing three-year window ending 2021 through 2025, on every trailing five-year window ending 2022 through 2025, and on the trailing ten-year window ending 2025.

128. The SC Fund has trailed its Prospectus Benchmark, the Russell 2000, on every trailing window ending 2024 and 2025 and on the three-year window ending 2023. On the compounded basis described in ¶ 97, the Fund's Alpha against the Russell 2000 was -4.38 over the three-year window ending December 31, 2023, -4.24 over the three-year window ending December 31, 2024, -8.20 over the three-year window ending December 31, 2025, -0.66 and -8.69 over the five-year windows ending December 31, 2024 and December 31, 2025, and -5.27 over the ten-year window ending December 31, 2025.[34] The Fund's Morningstar Investment Profile as of January 31, 2026, reports the same record over the trailing one-, three-, five-, and ten-year periods (¶ 134, *infra*).

129. Table 2.a below illustrates the SC Fund's performance as compared to the SC Comparator Funds based on: (i) yearly returns for the years 2016–2025; (ii) trailing three-year returns for the years 2018–2025; (iii) trailing five-year returns for the years 2020–2025; and (iv) trailing ten-year returns for 2025:

[34] Computed as ¶ 97 describes from the Fund's annual returns in Table 2.a and the Russell 2000's calendar-year returns for 2016 through 2025.

Table 2.a
**Small Cap Fund**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. SC Comparator Funds

| Fund | Annual Performance | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **SC Fund** | 16.42 | 15.40 | -8.82 | 28.37 | 22.98 | 15.52 | -21.67 | 13.07 | 12.38 | 7.50 |
| DFSTX | 23.53 | 11.52 | -13.13 | 21.75 | 11.17 | 30.61 | -13.53 | 17.64 | 11.49 | 8.07 |
| TISEX | 19.97 | 15.01 | -11.97 | 23.86 | 12.82 | 25.06 | -15.44 | 18.70 | 16.26 | 16.48 |
| QLSCX | — | 15.64 | -11.57 | 18.06 | 16.99 | 30.27 | -23.09 | 20.58 | 14.83 | 14.15 |
| FSCIX | 9.19 | 14.09 | -16.76 | 32.72 | 17.48 | 31.64 | -20.50 | 18.57 | 11.52 | 12.13 |
| *Delta* | -1.14 | 1.34 | 4.54 | 4.27 | 8.37 | -13.88 | -3.53 | -5.80 | -1.15 | -5.21 |
| **Trailing 3** | - | - | 4.72 | 10.46 | 18.12 | -2.68 | -9.97 | -21.74 | -10.17 | -11.73 |
| **Trailing 5** | - | - | - | - | 18.33 | 3.09 | -1.86 | -11.57 | -16.16 | -26.66 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -13.22 |

130. Table 2.b below illustrates the SC Fund's cumulative compounded performance from 2021 through 2025 as compared to the SC Comparator Funds and the Prospectus Benchmark:

Table 2.b
**Small Cap Fund**
Cumulative Compounded Performance vs. the Comparator Funds and the Prospectus Benchmark

| Fund / Benchmark | Cumulative Compounded Performance 2021–2025 | |
|---|---|---|
| | **Cumulative Compounded Performance** | **Underperformance vs. Comparator** |
| **SC Fund** | 23.60% | N/A |
| DFSTX | 60.08% | -36.48% |
| TISEX | 69.99% | -46.38% |
| QLSCX | 58.36% | -34.75% |
| FSCIX | 55.17% | -31.57% |
| *Comparator Average* | 60.90% | -37.29% |
| Russell 2000 | 34.41% | -10.80% |

131. As demonstrated above, the SC Fund consistently underperformed the four SC Comparator Funds, causing substantial losses to the Plan's participants.

132. Table 2.c below shows the record comparator by comparator over the fifteen trailing windows computable from the annual returns pleaded in Table 2.a and the Russell 2000's calendar-year returns:[35]

Table 2.c

**Small Cap Fund**

Trailing Compounded Differentials as of December 31, 2025, and Windows Underperformed vs. SC Comparator Funds and Benchmark

| Comparator / Benchmark | Trailing 3 (2025) | Trailing 5 (2025) | Trailing 10 (2025) | Trailing windows underperformed (18–25) |
|---|---|---|---|---|
| DFSTX | -4.27 | -25.33 | -10.41 | 9 of 15 |
| TISEX | -17.44 | -29.97 | -19.47 | 9 of 15 |
| QLSCX | -15.78 | -27.18 | — | 8 of 12 |
| FSCIX | -9.10 | -24.65 | -10.83 | 11 of 15 |
| Comparator Average | -11.73 | -26.66 | -13.22 | 10 of 15 |
| Russell 2000 | -8.20 | -8.69 | -5.27 | 7 of 15 |

133. On the compounded basis stated in ¶ 97, *supra*, FSCIX outperformed the SC Fund on eleven of the fifteen trailing windows and on every window ending 2021 or later; DFSTX on nine of the fifteen and on every window ending 2022 or later; TISEX on nine of the fifteen; QLSCX on eight of the twelve windows computable from its pleaded returns, which begin in 2017; the average of the SC Comparator Funds on ten of the fifteen; and the Russell 2000 on seven of the fifteen. The record turned at year-end 2022: on the three-year window ending December 31, 2022, every SC Comparator Fund and their average were ahead of the Fund, and on the five-year window ending that date the average, DFSTX,

35 The Russell 2000 row is computed from the index's calendar-year returns for 2016 through 2025.

and FSCIX were ahead. The breach Plaintiffs plead as to the SC Fund is therefore the failure to remove it once its record turned—rather than its original selection. From year-end 2023, every SC Comparator Fund and their average have been ahead of the Fund on every trailing window—all seven windows ending 2023, 2024, and 2025 against DFSTX, TISEX, FSCIX, and their average, and all six computable against QLSCX—and the Russell 2000 has been ahead on the three-year window ending 2023 and on every window ending 2024 and 2025. As of December 31, 2025, every SC Comparator Fund, their average, and the Russell 2000 are ahead of the Fund on every trailing window. A fund that has trailed every one of its peers and their average on every standard monitoring window at three consecutive year-ends, and its Prospectus Benchmark on every window at the last two, is chronically underperforming.

134. The SC Fund's disclosures report the same record. Its Morningstar Investment Profile as of January 31, 2026, reports the Fund trailing the Russell 2000 over the trailing one-year (10.57% against 15.81%), three-year (9.74% against 12.20%), five-year (4.92% against 6.16%), and ten-year (10.67% against 11.21%) periods, and trailing the Small Blend category average over the three-, five-, and ten-year periods (10.42%, 8.03%, and 10.79%). The Plan's Investment Options at a Glance sheet lists the SC Fund beside the Plan's State Street Russell Small Cap Index fund. For each of the one-, three-, and five-year periods ending December 31, 2025, the sheet shows the index fund ahead of

the SC Fund (12.79% against 7.50% for one year, 13.72% against 10.96% for three years, and 6.09% against 4.33% for five years)—at an expense ratio of 0.04% against 0.42%.[36]

135. Prudent alternatives were readily at hand. One was already inside the Fund and already on the Plan's menu: one-third of the SC Fund is the State Street Russell Small Cap Index fund (¶¶ 51, 53, *supra*), and the Plan offers the same index strategy to participants directly at an expense ratio of 0.04% (¶ 55, *supra*)—less than a tenth of the SC Fund's 0.42% expense ratio. Removing the SC Fund and mapping its balances to that index fund would have required no new manager, no new vehicle, and no new fee negotiation. Another was any of the SC Comparator Funds—widely available institutional-class small-cap funds that a plan of this size could have added or substituted, and each of which outperformed the Fund on every trailing window ending 2023, 2024, and 2025 (¶ 133, *supra*). The losses Plaintiffs plead measure the Fund against the SC Comparator Funds, that is, against what prudent active management of the same mandate delivered over the same period (¶ 122, *supra*; ¶¶ 216–218, *infra*); measured against the Russell 2000 that index fund tracks instead, the shortfall is smaller but runs in the same direction on every window ending 2024 and 2025 (¶ 128, *supra*; Table 2.c).

136. Instead, Defendants replaced the Fund's managers repeatedly while never reconsidering the Fund itself. The Plan's schedules of assets and prospectus supplements show the Committee replacing every one of the Fund's four actively managed sleeves

---

[36] SC Fund, Morningstar Investment Profile as of January 31, 2026, Trailing Returns (annualized); the Plan's Investment Options at a Glance sheet (returns as of the quarter ending December 31, 2025).

between 2021 and 2025. The Committee replaced the Advisory Research Small Cap Value sleeve by year-end 2021, the Emerging Growth sleeve (¶ 137, infra) and the Wellington Select Small Cap Growth sleeve by year-end 2023, and the Wellington Small Cap Value sleeve effective June 24, 2025. Throughout, the Committee held the index core at one-third of the Fund.[37]

137. Even worse, one of those sleeves was a party-in-interest holding. The Wells Fargo Emerging Growth Fund was a Wells Fargo proprietary fund held inside the SC Fund, marked on the Plan's schedules of assets as a party-in-interest holding, and one of the investments challenged in the *Becker* Action (¶ 226, *infra*). It remained in the SC Fund after that action settled, managed by a subsidiary of Allspring Global Investments, LLC (together with that subsidiary, "Allspring"). The Plan's 2022 Form 5500 carries the sleeve as "Allspring Emerging Growth CIT E4," a $255.0 million position as of December 31, 2022. That filing discloses that the Plan "may engage in transactions involving acquisition or disposition of units of participation in certain investments managed by a subsidiary of Allspring Global Investments, LLC" and that "[t]he Company has a noncontrolling interest in Allspring, which may be considered a party-in-interest with respect to the Plan." The Plan's 2023 and 2024 filings report that the Plan "engaged in transactions involving acquisition or disposition of units of participation in certain investments managed by a

---

[37] 2020–2024 Forms 5500, Schedule H, line 4i (the index sleeve at 33.72% of the Fund at December 31, 2020 and 33.99% at each year-end from 2021 through 2024); Wells Fargo & Company 401(k) Plan Prospectus, Supplement dated October 1, 2025 ("Prospectus updates effective June 24, 2025 … The Wellington Small Cap Value Fund within the Small Cap Fund was replaced with the Hotchkis & Wiley Small Cap Diversified Value Fund").

subsidiary of Allspring … through December 4, 2023." Defendants thus kept a party-in-interest sleeve that the *Becker* Action had challenged inside the SC Fund for fourteen months *after* the *Becker* settlement became final on October 3, 2022 (¶ 228, *infra*), including eleven months of the first year in which a prudent fiduciary would already have removed the Fund. Those facts are pleaded in Count III as prohibited transactions. They are pleaded here as further evidence that Defendants' process for the SC Fund served interests other than those of the participants.[38]

138. A conservative illustration demonstrates the scale of the losses. As of December 31, 2024, the assets in the SC Fund had an approximate value of $1.64 billion. Assuming, for illustrative purposes only, that the approximately $1.64 billion in assets reflects compound growth on a single starting principal, and given that the SC Fund produced cumulative compounded growth of 23.60% from 2021 through 2025, the implied underlying principal at the start of 2021 would be approximately $1.33 billion ($1.64 billion divided by 1.2360[39]). Had that same amount instead been invested across the SC Comparator Funds, which produced average cumulative compounded growth of 60.90% over the same period (*see* Table 2.b, "Comparator Average"), it would have grown to approximately $2.13 billion. This illustration suggests that Plan participants lost

---

[38] 2020–2022 Forms 5500, Schedule H, line 4i (the asterisked Emerging Growth sleeve); 2020 Form 5500, Note 13 (Legal Actions); 2022–2024 Forms 5500, related-party notes.

[39] The divisor of 1.2360 represents each dollar of starting principal ($1.00) plus the 23.60% cumulative compounded growth ($0.2360).

approximately $495 million as a result of Defendants' decision to retain the SC Fund rather than a prudent alternative. That illustration measures the cost of the retention decision from 2021. The losses Plaintiffs seek to recover are measured from January 1, 2023, the year after the year-end at which the Fund trailed every SC Comparator Fund on the trailing three-year window and their average on both standard windows, and are set out in ¶¶ 216–220 and Table 10 below.

139. The foregoing return, trailing 3, 5, and 10-year return and cumulative performance information is information Defendants would have had available had they conducted a simple analysis evaluating the SC Fund and compared its performance to its Prospectus Benchmark or any of the SC Comparator Funds.

140. A prudent fiduciary monitoring the SC Fund's performance would have compared the fund's returns to returns of the fund's stated Prospectus Benchmark and one or more of the Comparator Funds identified in Table 2.a and Table 2.b.

141. When considering whether to retain a small cap fund in a plan, a prudent fiduciary would evaluate the fund's risk and return characteristics as compared to the entire universe of comparable available funds based on qualitative and quantitative metrics. A prudent fiduciary could not have reasonably concluded that retention of the SC Fund was appropriate for the Plan.

### D. The State Street TDF 2035–2060 Series Consistently Underperformed as Compared to Meaningful Benchmarks

142. As detailed below, the State Street TDF Series' Prospectus Benchmark is inappropriate. Measured against the average of three comparator series of similar allocation

and glide path, the Series has significantly underperformed on a trailing 3, 5, and 10-year basis and on a cumulative basis.

1. The Prospectus Benchmark Used to Analyze the Performance of the State Street TDF Series Is Inappropriate

143. While the Series' profiles show it ahead of its Prospectus Benchmark—the Morningstar Lifetime Mod Target Date TR USD Index (the "Morningstar Index")—on the trailing three-year period and since inception, that benchmark is an inappropriate measure of the Series' performance. It does not reflect the strategy and investment objectives of the Series. The Series' profiles do not disclose the composition of the custom benchmark index each vintage seeks to approximate (¶ 65, *supra*) or the Series' return against it; the only benchmark return they report is the Morningstar Index's.[40]

144. First, the Morningstar Index is not tailored to the Series' actual investment strategy, asset allocation, or glide path. Indeed, as demonstrated by the comparative analysis set forth herein, the Morningstar Index diverges from the Series' actual strategy in composition, rendering it an inappropriate benchmark for evaluating the Series' performance.

---

[40] The State Street TDF Series fact sheets represent that each fund "seeks an investment return that approximates, as closely as practicable, before expenses, the performance of a *custom benchmark* index." Notwithstanding this representation, the benchmark against which the Series is actually measured is the Morningstar Lifetime Mod Target Date TR USD Index, a standard, commercially available index published by Morningstar.

145. The divergence between the Morningstar Index and the Series' actual investment strategy is demonstrated by a comparative equity allocation analysis of the six vintages at issue.

146. The Morningstar Index's equity allocation differs from that of every vintage of the State Street TDF Series, holding less equity than the 2035 and 2040 vintages and more than the 2045 through 2060 vintages:[41]

| Fund Family | Vintage Year (Total Equity Allocation) | | | | | |
|---|---|---|---|---|---|---|
| | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
| State Street | 68.22 | 75.57 | 81.91 | 86.75 | 89.65 | 89.65 |
| Morningstar | 63.46 | 74.47 | 84.05 | 89.92 | 92.15 | 92.73 |

147. The divergence is one of composition. At every vintage the Morningstar Index holds more U.S. equity and less non-U.S. equity than the Series:

| Fund Family | Vintage Year (U.S. Equity Allocation) | | | | | |
|---|---|---|---|---|---|---|
| | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
| State Street | 38.87 | 42.77 | 46.31 | 49.01 | 50.62 | 50.62 |
| Morningstar | 42.99 | 49.55 | 54.96 | 57.81 | 58.24 | 57.61 |

| Fund Family | Vintage Year (Total non-U.S. Equity Allocation) | | | | | |
|---|---|---|---|---|---|---|
| | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
| State Street | 29.35 | 32.80 | 35.60 | 37.74 | 39.03 | 39.03 |
| Morningstar | 20.47 | 24.92 | 29.09 | 32.11 | 33.91 | 35.12 |

148. An index whose composition departs from that of the fund it purports to measure will track the fund's returns only by coincidence, because the two are exposed to different markets and their returns move apart whenever those markets diverge, regardless

[41] The State Street TDF Series' allocations are taken from the Class A profiles as of January 31, 2026. The Morningstar Index allocations for each vintage are as compiled in the investment data on which Plaintiffs rely.

of the fund manager's skill. The Morningstar Index departs from the Series in both directions—it holds less equity than the 2035 and 2040 vintages and more equity than the 2045 through 2060 vintages—and at every vintage it holds more U.S. equity (by 4.1 to 8.8 percentage points) and less non-U.S. equity (by 3.9 to 8.9 percentage points) than the Series does. The Series' returns against that Morningstar Index therefore reflect the gap between the two allocations as much as the quality of the Series' management, and the Series' outperformance of the Morningstar Index is not a reliable measure of how well the Series was managed.

149. The inadequacy of the Morningstar Index as a benchmark is further underscored by the mismatch between the Morningstar Index's stated risk profile and the Series' actual risk characteristics. Notably, the Morningstar Index is specifically described in the Series' fact sheet as having a *moderate* risk profile, calibrated for investors "comfortable with ***average*** exposure to equity market volatility." Yet Morningstar's three-year risk ratings of the Series (contained in the same fact sheets) rate every vintage as carrying "Above Average" or "High" risk relative to its target date peer category. Specifically, over the trailing three years the 2035, 2050, and 2055 vintages are each rated "High" risk relative to category peers, while the 2040, 2045, and 2060 vintages are rated "Above Average." Morningstar Risk is a peer-relative measure of a fund's downside variation within its category; the like-for-like comparison of the Series' risk with its comparators'—standard deviation, Sharpe ratio, beta, and $R^2$—is set out in ¶¶ 158–159. Whatever the Series' risk relative to the full category, the relevant comparison is its risk relative to the Comparator TDFs. On that comparison, the Series took the same risk and

earned lower returns (¶¶ 158–159). Benchmarking an above-average or high-risk fund against an index calibrated for average risk tolerance systematically obscures the true extent of the Series' underperformance on a risk-adjusted basis.

150. None of the three comparator series discussed below uses the Morningstar Index as its prospectus benchmark,[42] which confirms that measuring the Series against that index is not dictated by industry practice.

151. Benchmarking the Series against this index is itself evidence of an imprudent monitoring process because it shows the Series outperforming an index that the Series does not resemble. As discussed below, the three comparator series mirror the Series' allocation and investment objectives and reveal sustained and material underperformance that a prudent fiduciary would have identified and acted upon.

2. Meaningful Benchmarks to Compare the Investment Performance of the State Street TDF Series

152. In evaluating the performance of the State Street TDF Series, Plaintiffs have identified three peer comparator series, each of which is offered by major market vendors, and which closely mirror the Series' investment characteristics across every relevant dimension, including fundamental investment objectives, strategy, and structure, ensuring

---

42 American Funds Target Date Retirement Series, Prospectus (January 1, 2026); Fidelity Freedom Funds, Prospectus (May 30, 2026); Vanguard Target Retirement Funds, Prospectus (January 28, 2026). No Morningstar index appears in any of the three.

that any identified performance differential reflects genuine deficiencies in investment management rather than structural or categorical differences among the funds:[43]

| Fund | Comparator TDFs |
|---|---|
| **State Street TDF Series** | Fidelity Freedom K6 ("Fidelity") |
| | Vanguard Target Retirement Fund ("Vanguard") |
| | American Funds Target Date Retire R-6 ("American") |

153. The three Comparator TDFs—American Funds, Fidelity, and Vanguard—are meaningful comparators for the State Street TDF Series. Like the State Street TDF Series, each Comparator TDF is a target date series structured as a fund of funds, and each shares the Series' fundamental investment objective—a diversified, professionally managed retirement portfolio whose asset allocation adjusts along a preset glide path as the participant's target retirement date approaches. Morningstar classifies each vintage of the State Street TDF Series and the corresponding vintage of every Comparator TDF in the same analytical category—Target-Date 2035, Target-Date 2040, and so on through Target-Date 2060.[44] That comparability is confirmed, vintage by vintage, by the funds' published

[43] The term "Comparator TDFs" as used herein refers collectively to: (1) Fidelity, (2) Vanguard, and (3) American.

[44] Unless otherwise indicated, the SS TDF's data in the tables in this Section are taken from the Morningstar Investment Profiles of the Plan's Class A vintages as of January 31, 2026, and the Comparator TDFs' data from the Morningstar Investment Profiles of each fund, whose portfolio and risk data are as of June 30, 2026 (Vanguard, July 31, 2026). The Series' annual returns for 2014 through 2017 (2016 and 2017 for the 2060 vintage), the Comparator TDFs' returns for 2014 and 2015 and the Fidelity Freedom K6 returns for 2016 and 2017, which the profiles do not print, are as compiled in the investment data on which Plaintiffs rely, except that the 2014 returns of the American Funds 2045 and Fidelity Freedom 2045 vintages in Table 6.a are taken from those funds' 2015 summary

portfolio data. As set forth below, each vintage of the Series and its comparators: (i) hold similar total equity allocations at the same point on the glide path; (ii) follow glide paths of the same design; (iii) carry comparable risk profiles; and (iv) are institutional-scale vehicles—with the State Street TDF Series the least expensive of the group at every vintage, so that its underperformance cannot be attributed to cost.

154. **Similar Equity Allocations.** A target date fund's risk-and-return profile is driven first by its allocation to equities at each point on its glide path. The table below compares each vintage of the State Street TDF Series with the corresponding vintage of each Comparator TDF:

<u>State Street TDF Series vs. Comparator TDFs: Total Equity Allocation by Vintage</u>

| Vintage | SS TDF | American | Fidelity | Vanguard | Comp. Avg. | Fund v. Avg. |
|---|---|---|---|---|---|---|
| **2035** | 68.22 | 62.03 | 68.60 | 66.28 | 65.64 | +2.58 |
| **2040** | 75.57 | 75.05 | 82.77 | 73.75 | 77.19 | -1.62 |
| **2045** | 81.91 | 83.73 | 91.79 | 77.89 | 84.47 | -2.56 |
| **2050** | 86.75 | 85.78 | 93.66 | 86.46 | 88.63 | -1.88 |
| **2055** | 89.65 | 87.67 | 95.27 | 87.48 | 90.14 | -0.49 |
| **2060** | 89.65 | 87.53 | 95.56 | 87.46 | 90.18 | -0.53 |

155. At every vintage, the State Street TDF Series' total equity allocation is within approximately 2.6 percentage points of the Comparator TDFs' average, and the Series and its comparators move together up the glide path—from approximately 62.0% to

prospectuses. Returns are stated net of each fund's ongoing expenses, as Morningstar reports them. Where a profile reports returns for periods before the share class shown was available, they are based on the performance of a separate share class of the same fund with a higher expense, as the profile states. Defendants possess, or can readily obtain, fully period-matched data for every fund.

approximately 68.6% in equities at the 2035 vintage to approximately 87.5% to approximately 95.6% at the 2060 vintage. Vanguard Target Retirement, moreover, holds less equity than the Series at every vintage and, as Table 3 shows, outperformed it on the trailing five-year window ending 2025 at every vintage; the comparators did not outperform the Series by holding more equity. Nor does the comparison turn on composition—the Comparator TDFs' average holds within approximately 4.9 percentage points of the Series' U.S. equity allocation and within approximately 4.1 points of its non-U.S. equity allocation at every vintage (Appendix A). Stated otherwise, at each target date the Series and its comparators hold similar amounts of equity risk, in the same market, for the same purpose.

156. **Glide Paths of the Same Design.** Each of the four series—the State Street TDF Series and the three Comparator TDFs—publishes a glide path that continues to reduce equity exposure after the target retirement date rather than reaching a fixed allocation at retirement (a "through retirement" design), as their Morningstar profiles report. Each begins at approximately 90% or more in equities thirty years and more before the target date and reduces that allocation as the target date approaches. Funds following glide paths of the same design, with similar equity allocations at each vintage, expose their investors to the same pattern of market risk over time; performance differences between them reflect the quality of the underlying investments and of each manager's implementation of its glide path.

157. **Construction of the Underlying Portfolios.** As set forth above (¶ 58), every target date series is actively managed: its sponsor designs the glide path, sets and revises

the asset allocation, and selects and replaces the underlying funds used to implement that allocation. The series differ only in the underlying funds their sponsors select. The State Street TDF Series implements its allocation through State Street index funds; Vanguard Target Retirement implements its allocation through Vanguard index funds; and American Funds Target Date Retirement and Fidelity Freedom implement their allocations through their sponsors' actively managed funds.[45] Plaintiffs plead comparators built on index funds and comparators built on actively managed funds. Vanguard, like the Series, is built on index funds and is priced within four basis points of the Series. The fact that the Series nevertheless trailed Vanguard confirms that its underperformance resulted from the decisions its sponsor made within that allocation and the Committee failed to monitor, rather than from the funds it holds. As set forth in Tables 4.a through 9.b, every vintage of the State Street TDF Series trailed the average of all three comparators over the trailing periods that a prudent fiduciary monitors.

158. **Comparable Risk Profiles.** A meaningful comparison also requires that the comparator funds carry comparable risk. Standard deviation is the foundational statistical measure of investment risk, and the Sharpe ratio measures the return a fund delivered for each unit of risk it took; both are reported by Morningstar for every fund in the comparison

---

45 Each of the four series is a fund of funds, as its Morningstar profiles state. The State Street TDF Series invests in State Street index funds (¶ 65, *supra*); Vanguard Target Retirement "invests in a mix of Vanguard mutual funds," each of them an index fund; American Funds Target Date Retirement invests "in a mix of American Funds in different combinations and weightings"; and Fidelity Freedom "invests in a combination of Fidelity U.S. equity funds, international equity funds, bond funds, and short-term funds."

on a trailing three-year basis. The following sets out the statistics for each vintage (each fund's beta, $R^2$, and calculation benchmark are set out in Appendix A):[46]

State Street TDF Series vs. Comparator TDFs: Risk Metrics by Vintage

| Vintage | SS TDF: Std. Dev. (3-Yr) | Comparators: Std. Dev. range | Comp. Avg. | SS TDF: Sharpe (3-Yr) | Comparators: Sharpe range | Comp. Avg. |
|---|---|---|---|---|---|---|
| **2035** | 9.75 | 9.47–10.27 | 9.79 | 0.87 | 0.89–0.93 | 0.91 |
| **2040** | 10.30 | 10.24–11.48 | 10.89 | 0.90 | 0.94–1.02 | 0.98 |
| **2045** | 10.74 | 10.87–12.12 | 11.54 | 0.93 | 0.98–1.07 | 1.01 |
| **2050** | 11.17 | 11.46–12.21 | 11.86 | 0.95 | 0.97–1.06 | 1.01 |
| **2055** | 11.28 | 11.50–12.26 | 12.01 | 0.96 | 0.96–1.07 | 1.01 |
| **2060** | 11.28 | 11.49–12.39 | 12.04 | 0.96 | 0.96–1.07 | 1.01 |

159. At every vintage the Series' three-year standard deviation sits within approximately one percentage point of the Comparator TDFs' average, and at every vintage the Series' Sharpe ratio is at or below the lowest Sharpe ratio of any comparator. The Series delivered no more return per unit of risk than any of them. On the one measure computable for every fund on an identical basis—the sample standard deviation of the calendar-year returns pleaded in Tables 4.a through 9.a for 2018 through 2025, the first full calendar year after the Class A units' inception—each vintage of the Series sits inside its comparators' range. For the 2035 vintage the figure is 14.30 against 13.50 to 14.82, and for the 2060 vintage 15.85 against 15.24 to 16.10. The Comparator TDFs did not achieve the returns pleaded in Tables 4.a through 9.b by taking on greater risk.

---

46 Three-year statistics as reported on each fund's Morningstar profile (the State Street TDF Series as of January 31, 2026; American Funds and Fidelity Freedom as of June 30, 2026; Vanguard as of July 31, 2026), each as computed by Morningstar against the calculation benchmark the profile names; each fund's beta, $R^2$, and calculation benchmark are set out in Appendix A.

160. **Institutional Scale and Lower Cost.** The Comparator TDFs are among the largest and most widely adopted target date families in the defined contribution market—the vintages in the comparison hold $4.49 billion to $127.29 billion each, against $393.3 million to $1.79 billion held in the State Street TDF Series' Class A units—and every fund in the comparison is an institutional-scale vehicle:

State Street TDF Series vs. Comparator TDFs: Expense Ratio by Vintage

| Vintage | SS TDF | American | Fidelity | Vanguard |
|---|---|---|---|---|
| **2035** | 0.04% | 0.34% | 0.38% | 0.08% |
| **2040** | 0.04% | 0.36% | 0.42% | 0.08% |
| **2045** | 0.04% | 0.37% | 0.45% | 0.08% |
| **2050** | 0.04% | 0.37% | 0.45% | 0.08% |
| **2055** | 0.041% | 0.38% | 0.45% | 0.08% |
| **2060** | 0.041% | 0.39% | 0.45% | 0.08% |

161. Under the negotiated fee the Plan put in place on March 31, 2023, the Class A vintages cost 0.04% and 0.041%; the American Funds and Fidelity Freedom vintages cost 0.34% to 0.45% and the Vanguard vintages cost 0.08%. The returns compared in Tables 4.a through 9.b are stated net of each fund's ongoing expenses, so the Series' fee advantage is already reflected in every figure pleaded for periods after March 31, 2023.

162. Nor does the Series' vehicle distinguish it. The Plan holds the Series through collective investment fund units rather than mutual fund shares, but Morningstar reports data for both using identical metrics and classifications, and the Plan's profiles for the Series are Morningstar Investment Profiles that place each vintage in the same Target-Date category as its comparators.

163. Fiduciaries selecting a target date series for plan participants would reasonably evaluate the performance of the selected series against other series pursuing

similar strategies and operating within the same asset class. The Comparator TDFs are widely available mutual funds—the American Funds and Fidelity Freedom series in their institutional share classes and the Vanguard series in its Investor Shares—that pursue materially similar mandates; accordingly, they represent meaningful peer funds against which a prudent fiduciary would evaluate whether the State Street TDF Series delivered competitive performance and value for the Plan's participants.

164. In sum, each vintage of the Series and its Comparator TDFs hold similar equity allocations, follow glide paths of the same design, carry comparable risk profiles, and are institutional-scale vehicles. The Comparator TDFs are meaningful benchmarks against which the Series' performance—and Defendants' prudence in selecting and retaining it—can fairly be measured.

3. The State Street TDF Series Consistently Underperformed as Compared to the Comparator TDFs

165. As detailed below, the vintages of the Series at issue have significantly underperformed the average of the Comparator TDFs on a trailing 3, 5, and 10-year basis and on a cumulative basis—and have trailed that average both before and after Defendants selected the Series. Table 3 sets out the record vintage by vintage and comparator by comparator. It states the compounded difference between each vintage's returns and each comparator's over the trailing three-, five-, and ten-year windows ending December 31, 2025, the number of the trailing windows in which the vintage outperformed the comparator, and the same count for the windows ending after the Series' 2023 selection:

Table 3
**State Street TDF Series**
Trailing Compounded Differentials as of December 31, 2025, and Windows Outperformed vs. Each Comparator TDF, by Vintage

| Vintage / comparator | Trailing 3 (2025) | Trailing 5 (2025) | Trailing 10 (2025) | Trailing windows vintage outperformed comparator | Windows outperformed (3/2023–25) |
|---|---|---|---|---|---|
| **2035 — American** | -0.99 | -5.68 | -7.98 | 0 of 21 | 0 of 9 |
| **2035 — Fidelity** | -3.09 | -5.54 | -7.94 | 1 of 21 | 0 of 9 |
| **2035 — Vanguard** | -0.64 | -2.45 | +1.76 | 14 of 21 | 5 of 9 |
| **2035 — Comparator Average** | -1.57 | -4.55 | -4.79 | 1 of 21 | 0 of 9 |
| **2040 — American** | -4.86 | -8.93 | -11.73 | 0 of 21 | 0 of 9 |
| **2040 — Fidelity** | -7.33 | -10.71 | -12.32 | 0 of 21 | 0 of 9 |
| **2040 — Vanguard** | -1.28 | -3.83 | -0.70 | 7 of 21 | 1 of 9 |
| **2040 — Comparator Average** | -4.51 | -7.85 | -8.36 | 0 of 21 | 0 of 9 |
| **2045 — American** | -4.67 | -8.11 | -10.16 | 0 of 21 | 0 of 9 |
| **2045 — Fidelity** | -8.14 | -11.14 | -10.92 | 3 of 21 | 0 of 9 |
| **2045 — Vanguard** | -2.35 | -5.67 | -2.67 | 5 of 21 | 0 of 9 |
| **2045 — Comparator Average** | -5.06 | -8.32 | -7.95 | 2 of 21 | 0 of 9 |
| **2050 — American** | -3.52 | -6.28 | -8.60 | 0 of 21 | 0 of 9 |
| **2050 — Fidelity** | -6.08 | -9.05 | -8.38 | 2 of 21 | 0 of 9 |
| **2050 — Vanguard** | -3.04 | -6.34 | -2.94 | 6 of 21 | 0 of 9 |
| **2050 — Comparator Average** | -4.21 | -7.22 | -6.65 | 2 of 21 | 0 of 9 |
| **2055 — American** | -3.96 | -6.15 | -8.41 | 0 of 21 | 0 of 9 |
| **2055 — Fidelity** | -5.50 | -8.50 | -7.62 | 3 of 21 | 0 of 9 |
| **2055 — Vanguard** | -2.48 | -5.83 | -2.34 | 7 of 21 | 0 of 9 |
| **2055 — Comparator Average** | -3.97 | -6.82 | -6.13 | 2 of 21 | 0 of 9 |
| **2060 — American** | -4.21 | -6.15 | -8.40 | 0 of 15 | 0 of 7 |
| **2060 — Fidelity** | -5.55 | -8.46 | -7.59 | 3 of 15 | 0 of 7 |
| **2060 — Vanguard** | -2.48 | -5.82 | -2.31 | 6 of 15 | 0 of 7 |
| **2060 — Comparator Average** | -4.07 | -6.80 | -6.11 | 2 of 15 | 0 of 7 |

166. **The Record at Selection.** When the Committee selected the Series effective March 31, 2023 (¶¶ 59–65, *supra*), the Series' published record through December 31, 2022, was in front of it, and so were the records of the Comparator TDFs. On the trailing three-year window ending December 31, 2022, every vintage of the Series trailed the corresponding American Funds vintage ("American" in Tables 4.a through 9.b) by 1.57 to 4.04 percentage points on the compounded basis described in ¶ 97, and the corresponding

Fidelity Freedom vintage ("Fidelity" in those tables) by 1.51 to 3.19 points. On the trailing five-year window, every vintage of the Series trailed the corresponding American Funds vintage by 4.37 to 6.76 points and the corresponding Fidelity Freedom vintage by 2.13 to 4.08 points. Only Vanguard's returns were close to the Series' returns, within two points in either direction at every vintage. The Committee chose the series whose published record placed it behind American Funds and Fidelity Freedom TDFs at every vintage, and it made that series the Plan's qualified default investment alternative—the destination for the contributions of every participant without an investment election on file (¶ 67, *supra*).

167. **The Record After Selection.** The windows a fiduciary monitoring the Series after March 2023 would have reviewed are the trailing three-, five-, and ten-year windows ending December 31, 2023, 2024, and 2025—nine windows for each vintage (seven for the 2060 vintage, whose pleaded returns begin in 2016). Every vintage of the Series trailed American Funds, Fidelity Freedom, and the Comparator TDF average on every one of them. Against Vanguard, the Series trailed on every post-selection window at the 2045, 2050, 2055, and 2060 vintages, on eight of nine at the 2040 vintage, and on four of nine at the 2035 vintage. No vintage of the Series has outperformed American Funds on any trailing window computable from the pleaded returns. On a cumulative basis over the calendar years 2023 through 2025, every vintage trailed each of the three Comparator TDFs and their average (Tables 4.b through 9.b).

*a. The State Street 2035 Vintage*

168. The State Street 2035 TDF has underperformed the average of its Comparator TDFs on every trailing three-year and five-year window ending 2021 through 2025 and on every trailing ten-year window ending 2023 through 2025.

169. Table 4.a illustrates the 2035 State Street TDF's performance as compared to the 2035 vintages of the Comparator TDFs based on: (i) yearly returns for the years 2014–2025; (ii) trailing three-year returns for the years 2016–2025; (iii) trailing five-year returns for the years 2018–2025; and (iv) trailing ten-year returns for 2023–2025:

Table 4.a
**State Street 2035 TDF**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. Comparator TDFs

| Fund | Annual Performance | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **SS** | 6.51 | -2.04 | 8.75 | 19.47 | -7.30 | 22.94 | 18.46 | 12.38 | -17.87 | 17.00 | 10.70 | 18.13 |
| Fidelity | 5.75 | -0.21 | 8.63 | 22.20 | -8.15 | 24.74 | 17.41 | 14.56 | -17.51 | 18.06 | 11.33 | 19.56 |
| Vanguard | 7.24 | -1.26 | 8.26 | 19.12 | -6.58 | 22.44 | 14.79 | 12.96 | -16.62 | 17.14 | 11.78 | 17.54 |
| American | 7.02 | 0.59 | 8.00 | 21.04 | -5.14 | 23.29 | 17.55 | 15.54 | -16.24 | 16.90 | 12.73 | 17.17 |
| *Delta* | -0.16 | -1.75 | 0.45 | -1.32 | -0.68 | -0.55 | 1.88 | -1.97 | -1.08 | -0.37 | -1.25 | 0.04 |
| **Trailing 3** | - | - | -1.46 | -2.60 | -1.54 | -2.52 | 0.63 | -0.68 | -1.21 | -3.39 | -2.67 | -1.57 |
| **Trailing 5** | - | - | - | - | -3.41 | -3.79 | -0.24 | -2.65 | -2.42 | -2.12 | -2.80 | -4.55 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -5.46 | -6.49 | -4.79 |

170. Table 4.b below illustrates the 2035 State Street TDF vintage's cumulative compounded performance over the calendar years 2023 through 2025 as compared to the 2035 vintages of the Comparator TDFs:[47]

[47] Tables 4.b through 9.b cover the calendar years 2023 through 2025. Defendants selected the Series effective March 31, 2023 (¶¶ 59–65, *supra*); 2025 is the last full calendar year for which returns are pleaded. Each figure is computed from the annual returns in Tables 4.a through 9.a by the method described in ¶ 97.

Table 4.b
**State Street 2035 TDF**
Cumulative Compounded Performance vs. the 2035 Comparator TDFs

| Fund | Cumulative Compounded Performance 2023–2025 | |
|---|---|---|
| | **Cumulative Compounded Performance** | **Underperformance vs. Comparator** |
| **State Street** | 53.00% | N/A |
| Fidelity | 57.15% | -4.14% |
| Vanguard | 53.91% | -0.91% |
| American | 54.41% | -1.41% |
| *Comparator Average* | 55.15% | -2.15% |

171. As of December 31, 2024, the assets in the State Street 2035 TDF had an approximate value of $1.24 billion. A conservative illustration demonstrates the scale of the vintage's shortfall. Assuming, for illustrative purposes only, that the approximately $1.24 billion in assets reflects compound growth on a single starting principal, and given that the State Street 2035 TDF produced cumulative compounded growth of 53.00% from 2023 through 2025, the implied underlying principal at the start of 2023 would be approximately $810.5 million ($1.24 billion divided by 1.5300). Had that same amount instead been invested across the 2035 Comparator TDFs, which produced average cumulative compounded growth of 55.15% over the same period (*see* Table 4.b, "Comparator Average"), it would have grown to approximately $1.26 billion. This illustration shows that the State Street 2035 TDF's shortfall against the average of the 2035 Comparator TDFs over the calendar years 2023 through 2025 amounts to approximately $17.4 million on the assets the Plan held in the vintage as of December 31, 2024. The losses

Plaintiffs seek to recover for the 2035 vintage, measured from January 1, 2024, the start of the first full calendar year after the selection, are set out in ¶¶ 216–220 and Table 10 below.

172. The foregoing return, 3, 5, and 10-year trailing return and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the 2035 State Street TDF vintage and compared its performance to the corresponding vintages of the Comparator TDFs.

173. A prudent fiduciary monitoring the 2035 State Street TDF vintage's performance would have compared the vintage's returns to returns from one or more of the Comparator TDFs identified in Table 4.a and Table 4.b.

174. When considering whether to retain a certain suite of TDFs in a plan, a prudent fiduciary would evaluate the TDF's risk and return characteristics as compared to the entire universe of TDFs available based on qualitative and quantitative metrics. A prudent fiduciary could not have reasonably concluded that retention of the 2035 State Street TDF vintage, or the State Street TDF Series as a whole, was appropriate for the Plan.

*b. The State Street 2040 Vintage*

175. The State Street 2040 TDF has underperformed the average of its Comparator TDFs on every trailing three-year and five-year window ending 2021 through 2025 and on every trailing ten-year window ending 2023 through 2025.

176. Table 5.a illustrates the 2040 State Street TDF's performance as compared to the 2040 vintages of the Comparator TDFs based on: (i) yearly returns for the years 2014–2025; (ii) trailing three-year returns for the years 2016–2025; (iii) trailing five-year returns for the years 2018–2025; and (iv) trailing ten-year returns for 2023–2025:

Table 5.a
**State Street 2040 TDF**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. Comparator TDFs

| Fund | Annual Performance | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **SS** | 6.39 | -2.25 | 9.20 | 20.47 | -7.88 | 23.92 | 19.01 | 13.35 | -18.37 | 17.91 | 11.47 | 19.32 |
| Fidelity | 5.71 | -0.18 | 8.60 | 22.42 | -8.75 | 25.70 | 18.53 | 16.70 | -18.06 | 20.26 | 13.61 | 22.34 |
| Vanguard | 7.15 | -1.59 | 8.73 | 20.71 | -7.32 | 23.86 | 15.47 | 14.56 | -16.98 | 18.34 | 12.88 | 18.76 |
| American | 6.96 | 0.58 | 8.17 | 21.98 | -5.52 | 24.40 | 18.77 | 16.83 | -17.55 | 19.33 | 14.79 | 19.50 |
| *Delta* | -0.22 | -1.85 | 0.70 | -1.23 | -0.68 | -0.73 | 1.42 | -2.68 | -0.84 | -1.40 | -2.29 | -0.88 |
| **Trailing 3** | - | - | -1.38 | -2.39 | -1.22 | -2.63 | -0.01 | -2.02 | -2.13 | -4.85 | -4.47 | -4.51 |
| **Trailing 5** | - | - | - | - | -3.26 | -3.76 | -0.55 | -3.89 | -3.51 | -4.21 | -5.71 | -7.85 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -7.33 | -9.26 | -8.36 |

177. Table 5.b below illustrates the 2040 State Street TDF vintage's cumulative compounded performance as compared to the 2040 vintages of the Comparator TDFs:

Table 5.b
**State Street 2040 TDF**
Cumulative Compounded Performance vs. the 2040 Comparator TDFs

| Fund | Cumulative Compounded Performance 2023–2025 | |
|---|---|---|
| | **Cumulative Compounded Performance** | **Underperformance vs. Comparator** |
| **State Street** | 56.83% | N/A |
| Fidelity | 67.15% | -10.32% |
| Vanguard | 58.64% | -1.81% |
| American | 63.69% | -6.86% |
| *Comparator Average* | 63.16% | -6.33% |

178. As of December 31, 2024, the assets in the State Street 2040 TDF had an approximate value of $1.44 billion. A conservative illustration demonstrates the scale of the vintage's shortfall. Assuming, for illustrative purposes only, that the approximately

$1.44 billion in assets reflects compound growth on a single starting principal, and given that the State Street 2040 TDF produced cumulative compounded growth of 56.83% from 2023 through 2025, the implied underlying principal at the start of 2023 would be approximately $918.2 million ($1.44 billion divided by 1.5683). Had that same amount instead been invested across the 2040 Comparator TDFs, which produced average cumulative compounded growth of 63.16% over the same period (*see* Table 5.b, "Comparator Average"), it would have grown to approximately $1.50 billion. This illustration shows that the State Street 2040 TDF's shortfall against the average of the 2040 Comparator TDFs over the calendar years 2023 through 2025 amounts to approximately $58.2 million on the assets the Plan held in the vintage as of December 31, 2024. The losses Plaintiffs seek to recover for the 2040 vintage, measured from January 1, 2024, are set out in ¶¶ 216–220 and Table 10 below.

179. The foregoing return, 3, 5, and 10-year trailing return and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the 2040 State Street TDF vintage and compared its performance to the corresponding vintages of the Comparator TDFs.

180. A prudent fiduciary monitoring the 2040 State Street TDF vintage's performance would have compared the vintage's returns to returns from one or more of the Comparator TDFs identified in Table 5.a and Table 5.b.

181. When considering whether to retain a certain suite of TDFs in a plan, a prudent fiduciary would evaluate the TDF's risk and return characteristics as compared to the entire universe of TDFs available based on qualitative and quantitative metrics. A

prudent fiduciary could not have reasonably concluded that retention of the 2040 State Street TDF vintage, or the State Street TDF Series as a whole, was appropriate for the Plan.

*c. The State Street 2045 Vintage*

182. The State Street 2045 TDF has underperformed the average of its Comparator TDFs on every trailing three-year and five-year window ending 2021 through 2025 and on every trailing ten-year window ending 2023 through 2025.

183. Table 6.a illustrates the 2045 State Street TDF's performance as compared to the 2045 vintages of the Comparator TDFs based on: (i) yearly returns for the years 2014–2025; (ii) trailing three-year returns for the years 2016–2025; (iii) trailing five-year returns for the years 2018–2025; and (iv) trailing ten-year returns for 2023–2025:

Table 6.a
**State Street 2045 TDF**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. Comparator TDFs

| | Annual Performance | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fund | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **SS** | 6.34 | -2.36 | 9.55 | 21.35 | -8.42 | 24.82 | 19.52 | 14.13 | -18.76 | 18.70 | 12.07 | 20.25 |
| Fidelity | 5.79 | -0.16 | 8.57 | 22.50 | -8.74 | 25.76 | 18.46 | 16.78 | -18.12 | 20.91 | 14.40 | 24.07 |
| Vanguard | 7.16 | -1.57 | 8.87 | 21.42 | -7.90 | 24.94 | 16.30 | 16.16 | -17.36 | 19.48 | 13.91 | 19.99 |
| American | 7.09 | 0.64 | 8.27 | 22.44 | -5.58 | 24.68 | 19.21 | 17.18 | -18.18 | 20.15 | 15.17 | 20.42 |
| *Delta* | -0.34 | -2.00 | 0.98 | -0.77 | -1.01 | -0.31 | 1.53 | -2.58 | -0.87 | -1.48 | -2.42 | -1.24 |
| **Trailing 3** | - | - | -1.37 | -1.80 | -0.81 | -2.08 | 0.19 | -1.39 | -1.95 | -4.86 | -4.71 | -5.06 |
| **Trailing 5** | - | - | - | - | -3.12 | -3.09 | 0.40 | -3.14 | -3.24 | -3.70 | -5.74 | -8.32 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -6.71 | -8.66 | -7.95 |

184. Table 6.b below illustrates the 2045 State Street TDF vintage's cumulative compounded performance as compared to the 2045 vintages of the Comparator TDFs:

Table 6.b
**State Street 2045 TDF**
Cumulative Compounded Performance vs. the 2045 Comparator TDFs

| Fund | Cumulative Compounded Performance 2023–2025 | |
|---|---|---|
| | **Cumulative Compounded Performance** | **Underperformance vs. Comparator** |
| **State Street** | 59.97% | N/A |
| Fidelity | 71.61% | -11.65% |
| Vanguard | 63.31% | -3.34% |
| American | 66.63% | -6.67% |
| *Comparator Average* | 67.18% | -7.22% |

185. As of December 31, 2024, the assets in the State Street 2045 TDF had an approximate value of $1.14 billion. A conservative illustration demonstrates the scale of the vintage's shortfall. Assuming, for illustrative purposes only, that the approximately $1.14 billion in assets reflects compound growth on a single starting principal, and given that the State Street 2045 TDF produced cumulative compounded growth of 59.97% from 2023 through 2025, the implied underlying principal at the start of 2023 would be approximately $712.7 million ($1.14 billion divided by 1.5997). Had that same amount instead been invested across the 2045 Comparator TDFs, which produced average cumulative compounded growth of 67.18% over the same period (*see* Table 6.b, "Comparator Average"), it would have grown to approximately $1.19 billion. This illustration shows that the State Street 2045 TDF's shortfall against the average of the 2045 Comparator TDFs over the calendar years 2023 through 2025 amounts to approximately $51.5 million on the assets the Plan held in the vintage as of December 31, 2024. The losses

Plaintiffs seek to recover for the 2045 vintage, measured from January 1, 2024, are set out in ¶¶ 216–220 and Table 10 below.

186. The foregoing return, 3, 5, and 10-year trailing return and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the 2045 State Street TDF vintage and compared its performance to the corresponding vintages of the Comparator TDFs.

187. A prudent fiduciary monitoring the 2045 State Street TDF vintage's performance would have compared the vintage's returns to returns from one or more of the Comparator TDFs identified in Table 6.a and Table 6.b.

188. When considering whether to retain a certain suite of TDFs in a plan, a prudent fiduciary would evaluate the TDF's risk and return characteristics as compared to the entire universe of TDFs available based on qualitative and quantitative metrics. A prudent fiduciary could not have reasonably concluded that retention of the 2045 State Street TDF vintage, or the State Street TDF Series as a whole, was appropriate for the Plan.

*d. The State Street 2050 Vintage*

189. The State Street 2050 TDF has underperformed the average of its Comparator TDFs on every trailing three-year and five-year window ending 2021 through 2025 and on every trailing ten-year window ending 2023 through 2025.

190. Table 7.a illustrates the 2050 State Street TDF's performance as compared to the 2050 vintages of the Comparator TDFs based on: (i) yearly returns for the years 2014–2025; (ii) trailing three-year returns for the years 2016–2025; (iii) trailing five-year returns for the years 2018–2025; and (iv) trailing ten-year returns for 2023–2025:

Table 7.a
**State Street 2050 TDF**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. Comparator TDFs

| Fund | Annual Performance | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **SS** | 6.34 | -2.37 | 9.55 | 21.35 | -8.53 | 25.04 | 19.93 | 14.59 | -19.08 | 19.51 | 12.66 | 20.99 |
| Fidelity | 5.78 | -0.24 | 8.63 | 22.57 | -8.74 | 25.65 | 18.48 | 16.79 | -18.10 | 20.87 | 14.44 | 24.05 |
| Vanguard | 7.18 | -1.58 | 8.85 | 21.39 | -7.90 | 24.98 | 16.39 | 16.41 | -17.46 | 20.17 | 14.64 | 21.41 |
| American | 7.02 | 0.65 | 8.33 | 22.61 | -5.61 | 25.04 | 19.42 | 17.27 | -18.89 | 20.83 | 15.43 | 20.43 |
| *Delta* | -0.32 | -1.98 | 0.95 | -0.84 | -1.11 | -0.18 | 1.83 | -2.23 | -0.93 | -1.11 | -2.18 | -0.97 |
| **Trailing 3** | - | - | -1.37 | -1.88 | -1.02 | -2.12 | 0.51 | -0.62 | -1.37 | -4.22 | -4.17 | -4.21 |
| **Trailing 5** | - | - | - | - | -3.29 | -3.15 | 0.61 | -2.56 | -2.64 | -2.64 | -4.59 | -7.22 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -5.84 | -7.60 | -6.65 |

191. Table 7.b below illustrates the 2050 State Street TDF vintage's cumulative compounded performance as compared to the 2050 vintages of the Comparator TDFs:

Table 7.b
**State Street 2050 TDF**
Cumulative Compounded Performance vs. the 2050 Comparator TDFs

| Fund | Cumulative Compounded Performance 2023–2025 | |
|---|---|---|
| | **Cumulative Compounded Performance** | **Underperformance vs. Comparator** |
| **State Street** | 62.90% | N/A |
| Fidelity | 71.59% | -8.69% |
| Vanguard | 67.26% | -4.36% |
| American | 67.97% | -5.07% |
| *Comparator Average* | 68.94% | -6.04% |

192. As of December 31, 2024, the assets in the State Street 2050 TDF had an approximate value of $1.46 billion. A conservative illustration demonstrates the scale of the vintage's shortfall. Assuming, for illustrative purposes only, that the approximately

$1.46 billion in assets reflects compound growth on a single starting principal, and given that the State Street 2050 TDF produced cumulative compounded growth of 62.90% from 2023 through 2025, the implied underlying principal at the start of 2023 would be approximately $896.3 million ($1.46 billion divided by 1.6290). Had that same amount instead been invested across the 2050 Comparator TDFs, which produced average cumulative compounded growth of 68.94% over the same period (*see* Table 7.b, "Comparator Average"), it would have grown to approximately $1.51 billion. This illustration shows that the State Street 2050 TDF's shortfall against the average of the 2050 Comparator TDFs over the calendar years 2023 through 2025 amounts to approximately $54.1 million on the assets the Plan held in the vintage as of December 31, 2024. The losses Plaintiffs seek to recover for the 2050 vintage, measured from January 1, 2024, are set out in ¶¶ 216–220 and Table 10 below.

193. The foregoing return, 3, 5, and 10-year trailing return and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the 2050 State Street TDF vintage and compared its performance to the corresponding vintages of the Comparator TDFs.

194. A prudent fiduciary monitoring the 2050 State Street TDF vintage's performance would have compared the vintage's returns to returns from one or more of the Comparator TDFs identified in Table 7.a and Table 7.b.

195. When considering whether to retain a certain suite of TDFs in a plan, a prudent fiduciary would evaluate the TDF's risk and return characteristics as compared to the entire universe of TDFs available based on qualitative and quantitative metrics. A

prudent fiduciary could not have reasonably concluded that retention of the 2050 State Street TDF vintage, or the State Street TDF Series as a whole, was appropriate for the Plan.

*e. The State Street 2055 Vintage*

196. The State Street 2055 TDF has underperformed the average of its Comparator TDFs on every trailing three-year and five-year window ending 2021 through 2025 and on every trailing ten-year window ending 2023 through 2025.

197. Table 8.a illustrates the 2055 State Street TDF's performance as compared to the 2055 vintages of the Comparator TDFs based on: (i) yearly returns for the years 2014–2025; (ii) trailing three-year returns for the years 2016–2025; (iii) trailing five-year returns for the years 2018–2025; and (iv) trailing ten-year returns for 2023–2025:

Table 8.a
**State Street 2055 TDF**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. Comparator TDFs

| Fund | Annual Performance | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **SS** | 6.34 | -2.35 | 9.56 | 21.35 | -8.53 | 25.09 | 19.91 | 14.58 | -19.07 | 19.56 | 12.81 | 21.37 |
| **Fidelity** | 5.75 | -0.20 | 8.56 | 22.40 | -8.68 | 25.67 | 18.46 | 16.77 | -18.07 | 20.85 | 14.43 | 24.06 |
| **Vanguard** | 7.19 | -1.72 | 8.88 | 21.38 | -7.89 | 24.98 | 16.32 | 16.44 | -17.46 | 20.16 | 14.64 | 21.43 |
| **American** | 7.01 | 0.63 | 8.30 | 22.63 | -5.65 | 25.09 | 19.39 | 17.28 | -19.50 | 21.40 | 15.58 | 20.74 |
| ***Delta*** | -0.31 | -1.92 | 0.98 | -0.79 | -1.12 | -0.16 | 1.85 | -2.25 | -0.73 | -1.24 | -2.07 | -0.71 |
| **Trailing 3** | - | - | -1.27 | -1.74 | -0.94 | -2.05 | 0.55 | -0.59 | -1.16 | -4.17 | -3.99 | -3.97 |
| **Trailing 5** | - | - | - | - | -3.14 | -2.99 | 0.74 | -2.48 | -2.43 | -2.54 | -4.41 | -6.82 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -5.61 | -7.28 | -6.13 |

198. Table 8.b below illustrates the 2055 State Street TDF vintage's cumulative compounded performance as compared to the 2055 vintages of the Comparator TDFs:

Table 8.b
**State Street 2055 TDF**
Cumulative Compounded Performance vs. the 2055 Comparator TDFs

| Fund | Cumulative Compounded Performance 2023–2025 | |
|---|---|---|
| | **Cumulative Compounded Performance** | **Underperformance vs. Comparator** |
| **State Street** | 63.70% | N/A |
| Fidelity | 71.56% | -7.86% |
| Vanguard | 67.27% | -3.57% |
| American | 69.42% | -5.72% |
| *Comparator Average* | 69.42% | -5.72% |

199. As of December 31, 2024, the assets in the State Street 2055 TDF had an approximate value of $652.4 million. A conservative illustration demonstrates the scale of the vintage's shortfall. Assuming, for illustrative purposes only, that the approximately $652.4 million in assets reflects compound growth on a single starting principal, and given that the State Street 2055 TDF produced cumulative compounded growth of 63.70% from 2023 through 2025, the implied underlying principal at the start of 2023 would be approximately $398.5 million ($652.4 million divided by 1.6370). Had that same amount instead been invested across the 2055 Comparator TDFs, which produced average cumulative compounded growth of 69.42% over the same period (*see* Table 8.b, "Comparator Average"), it would have grown to approximately $675.2 million. This illustration shows that the State Street 2055 TDF's shortfall against the average of the 2055 Comparator TDFs over the calendar years 2023 through 2025 amounts to approximately $22.8 million on the assets the Plan held in the vintage as of December 31, 2024. The losses

Plaintiffs seek to recover for the 2055 vintage, measured from January 1, 2024, are set out in ¶¶ 216–220 and Table 10 below.

200. The foregoing return, 3, 5, and 10-year trailing return and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the 2055 State Street TDF vintage and compared its performance to the corresponding vintages of the Comparator TDFs.

201. A prudent fiduciary monitoring the 2055 State Street TDF vintage's performance would have compared the vintage's returns to returns from one or more of the Comparator TDFs identified in Table 8.a and Table 8.b.

202. When considering whether to retain a certain suite of TDFs in a plan, a prudent fiduciary would evaluate the TDF's risk and return characteristics as compared to the entire universe of TDFs available based on qualitative and quantitative metrics. A prudent fiduciary could not have reasonably concluded that retention of the 2055 State Street TDF vintage, or the State Street TDF Series as a whole, was appropriate for the Plan.

*f. The State Street 2060 Vintage*

203. The State Street 2060 TDF has underperformed the average of its Comparator TDFs on every trailing three-year and five-year window ending 2021 through 2025 and on the trailing ten-year window ending 2025.

204. Table 9.a illustrates the 2060 State Street TDF's performance as compared to the 2060 vintages of the Comparator TDFs based on: (i) yearly returns for the years 2016–2025; (ii) trailing three-year returns for the years 2018–2025; (iii) trailing five-year returns for the years 2020–2025; and (iv) trailing ten-year returns for the year 2025:

Table 9.a
**State Street 2060 TDF**
Annual and 3-, 5-, and 10-Year Compounded Trailing Returns vs. Comparator TDFs

| Fund | Annual Performance | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **SS** | 9.57 | 21.34 | -8.53 | 25.06 | 19.90 | 14.60 | -19.08 | 19.57 | 12.80 | 21.37 |
| Fidelity | 8.61 | 22.33 | -8.69 | 25.60 | 18.53 | 16.71 | -18.09 | 20.87 | 14.39 | 24.13 |
| Vanguard | 8.84 | 21.36 | -7.87 | 24.96 | 16.32 | 16.44 | -17.46 | 20.18 | 14.63 | 21.42 |
| American | 8.41 | 22.49 | -5.64 | 25.01 | 19.44 | 17.19 | -19.66 | 21.61 | 15.60 | 20.77 |
| *Delta* | 0.95 | -0.72 | -1.13 | -0.13 | 1.80 | -2.18 | -0.68 | -1.32 | -2.07 | -0.74 |
| **Trailing 3** | - | - | -0.91 | -1.97 | 0.52 | -0.55 | -1.09 | -4.12 | -4.02 | -4.07 |
| **Trailing 5** | - | - | - | - | 0.75 | -2.38 | -2.33 | -2.52 | -4.42 | -6.80 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -6.11 |

205. Table 9.b below illustrates the 2060 State Street TDF vintage's cumulative compounded performance as compared to the 2060 vintages of the Comparator TDFs:

Table 9.b
**State Street 2060 TDF**
Cumulative Compounded Performance vs. the 2060 Comparator TDFs

| Fund | Cumulative Compounded Performance 2023–2025 | |
|---|---|---|
| | **Cumulative Compounded Performance** | **Underperformance vs. Comparator** |
| **State Street** | 63.70% | N/A |
| Fidelity | 71.63% | -7.93% |
| Vanguard | 67.27% | -3.57% |
| American | 69.78% | -6.08% |
| *Comparator Average* | 69.56% | -5.86% |

206. As of December 31, 2024, the assets in the State Street 2060 TDF had an approximate value of $293.8 million. A conservative illustration demonstrates the scale of the vintage's shortfall. Assuming, for illustrative purposes only, that the approximately

$293.8 million in assets reflects compound growth on a single starting principal, and given that the State Street 2060 TDF produced cumulative compounded growth of 63.70% from 2023 through 2025, the implied underlying principal at the start of 2023 would be approximately $179.5 million ($293.8 million divided by 1.6370). Had that same amount instead been invested across the 2060 Comparator TDFs, which produced average cumulative compounded growth of 69.56% over the same period (*see* Table 9.b, "Comparator Average"), it would have grown to approximately $304.3 million. This illustration shows that the State Street 2060 TDF's shortfall against the average of the 2060 Comparator TDFs over the calendar years 2023 through 2025 amounts to approximately $10.5 million on the assets the Plan held in the vintage as of December 31, 2024. The losses Plaintiffs seek to recover for the 2060 vintage, measured from January 1, 2024, are set out in ¶¶ 216–220 and Table 10 below.

207. The foregoing return, 3, 5, and 10-year trailing return and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the 2060 State Street TDF vintage and compared its performance to the corresponding vintages of the Comparator TDFs.

208. A prudent fiduciary monitoring the 2060 State Street TDF vintage's performance would have compared the vintage's returns to returns from one or more of the Comparator TDFs identified in Table 9.a and Table 9.b.

209. When considering whether to retain a certain suite of TDFs in a plan, a prudent fiduciary would evaluate the TDF's risk and return characteristics as compared to the entire universe of TDFs available based on qualitative and quantitative metrics. A

prudent fiduciary could not have reasonably concluded that retention of the 2060 State Street TDF vintage, or the State Street TDF Series as a whole, was appropriate for the Plan.

### E. Defendants Violated Their ERISA Fiduciary Duties by Failing to Timely Remove the Consistently Underperforming Challenged Funds

210. Each of the Defendants is, or during the Class Period was, a fiduciary of the Plan under ERISA. Accordingly, Defendants were obligated to vigorously and independently investigate the merits of each of the investment options available to the Plan, using prudent methods in conducting such investigation. 29 U.S.C. § 1104(a)(1)(B).

211. The LCG Fund and the SC Fund have been investment options in the Plan since their inception in October 2009, and Defendants—acting through the Committee—retained them throughout the Class Period. Importantly, the LCG Fund and SC Fund are the only actively managed large cap growth and small cap funds available in the Plan, respectively, and participants who want to pursue an actively managed large cap growth or small cap investment strategy have no choice other than to invest in the LCG Fund or the SC Fund, respectively. Likewise, Defendants selected the Series effective March 31, 2023, and retained it thereafter. Additionally, State Street's Target Retirement funds are the Plan's default investment option, and participants who want to invest in a target date fund have no choice other than to invest in State Street's Target Retirement funds.

212. Post-selection, as fiduciaries of the Plan, Defendants were responsible for monitoring the Challenged Funds' performance with the skill of a prudent expert to determine whether their investment performance was in line with meaningful comparators within a recognized peer universe.

213. Prudent fiduciaries of large defined contribution plans monitor plan investments through periodic—typically quarterly—reviews that evaluate each option's trailing three-, five-, and ten-year returns against its benchmark and a recognized peer universe. Prudent fiduciaries use those windows because they are the information available to a monitoring fiduciary in real time, and they are also the periods over which the Challenged Funds' Morningstar Investment Profiles and the Plan's Investment Options at a Glance sheet report returns (the ten-year period for the funds that have a ten-year record). The trailing-window figures pleaded in this Complaint are the figures Defendants' monitoring process was required to confront at each successive review. The cumulative figures measure the aggregate cost of the failure to act on them.

214. As demonstrated, the LCG Fund has consistently underperformed both its Prospectus Benchmark and the average of the LCG Comparator Funds on a trailing three-year basis for eight consecutive years (2018–2025), on a trailing five-year basis for six consecutive years (2020–2025), on a trailing ten-year basis for 2025, and on a cumulative compounded basis. Likewise, the SC Fund has consistently underperformed the average of the SC Comparator Funds on a trailing three-year basis for five consecutive years (2021–2025), on a trailing five-year basis for four consecutive years (2022–2025), on a trailing ten-year basis for 2025, and on a cumulative compounded basis. Finally, each vintage of the State Street TDF Series has consistently underperformed the average of the Comparator TDFs on a trailing three-year basis for five consecutive years (2021–2025), on a trailing five-year basis for five consecutive years (2021–2025), on every trailing ten-year window computable from the pleaded returns, and on a cumulative compounded basis.

215. Had participants invested their funds in the corresponding Comparator Funds during the relevant time period, they would, on average, have made significantly more by the start of 2026. The per-comparator summary tables show the same thing comparator by comparator. The LCG Fund never once outperformed AGRDX, JLGMX, the average of the LCG Comparator Funds, or its benchmark over the fifteen trailing windows computable from the pleaded returns (Table 1.d). The SC Fund trailed every SC Comparator Fund and their average on every window ending 2023 or later (¶ 133, *supra*). No vintage of the State Street TDF Series outperformed American Funds, Fidelity Freedom, or the average of the Comparator TDFs on any window ending after its selection (Table 3). Had Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have seen in real time that the Challenged Funds underperformed the averages of their comparators, and that the LCG Fund and the SC Fund trailed their Prospectus Benchmarks as well.

216. Had the amounts participants invested in the Challenged Funds instead been invested in the corresponding Comparator Funds from the start of the windows described below, those amounts would have earned, on average, approximately $1.04 billion more than they earned in the Challenged Funds through December 31, 2025, and as much as approximately $1.62 billion more measured against the strongest comparator for each Challenged Fund. The windows begin on the dates on which Defendants should have removed the Funds or, if later, at the start of the first full calendar year within the Class Period—January 1, 2021 for the LCG Fund; and January 1, 2023 for the SC Fund, the start of the year after the year-end at which it trailed every SC Comparator Fund on the trailing three-year window and their average on both standard windows. For the State Street TDF

Series, the window begins on January 1, 2024, the start of the first full calendar year after its selection. Table 10 sets out the computation for each Challenged Fund:[48]

Table 10
Losses to the Plan by Challenged Fund, Measured Against the Comp. Avg. and Strongest Comp. (Loss in $ millions; cumulative compounded returns over the window, in percent)

| Challenged Fund (window) | Assets, December 31, 2024 | Fund return | Comparator average return | Loss vs. average | Strongest comparator (return) | Loss vs. strongest comparator |
|---|---|---|---|---|---|---|
| **LCG Fund (21–25)** | 4,141.0 | 59.06 | 85.92 | 699.3 | LSGRX (100.73) | 1,084.9 |
| **SC Fund (23–25)** | 1,637.1 | 36.60 | 52.20 | 187.0 | TISEX (60.74) | 289.4 |
| **SC Fund, alternative window (24–25)** | 1,637.1 | 20.81 | 28.01 | 97.6 | TISEX (35.42) | 198.0 |
| **SS 2035 (24–25)** | 1,238.1 | 30.77 | 32.19 | 13.5 | Fidelity 2035 (33.11) | 22.1 |
| **SS 2040 (24–25)** | 1,440.7 | 33.01 | 36.74 | 40.4 | Fidelity 2040 (38.99) | 64.8 |
| **SS 2045 (24–25)** | 1,140.1 | 34.76 | 39.10 | 36.7 | Fidelity 2045 (41.94) | 60.7 |
| **SS 2050 (24–25)** | 1,461.7 | 36.31 | 40.05 | 40.2 | Fidelity 2050 (41.96) | 60.6 |
| **SS 2055 (24–25)** | 652.4 | 36.92 | 40.24 | 15.8 | Fidelity 2055 (41.96) | 24.0 |
| **SS 2060 (24–25)** | 293.8 | 36.91 | 40.26 | 7.2 | Fidelity 2060 (41.99) | 10.9 |
| **Total, with the SC Fund measured from 2023** | - | - | - | 1,040.2 | - | 1,617.5 |
| **Total, with the SC Fund measured from 2024** | - | - | - | 950.7 | - | 1,526.1 |

217. For the LCG Fund, the $4,141,025,163 in assets the Plan held in the Fund as of December 31, 2024, implies a principal of $2.60 billion at the start of 2021 (the assets

[48] Each figure in Table 10 is computed by the method of the illustrations in ¶¶ 106, 138, 171, 178, 185, 192, 199, and 206, applied over the window stated for each Fund and against the comparator average or, in the last column, the strongest comparator. The figures are conservative: they use audited year-end 2024 balances, a year before the windows close, and they exclude the LCG Fund's underperformance before 2021 and the SC Fund's before 2023. The benchmarks and indices shown in the tables are measures of comparative performance only and enter no figure in Table 10.

divided by 1.5906, one plus the Fund's 59.06% cumulative compounded return for 2021 through 2025). Invested instead across the LCG Comparator Funds, whose average cumulative compounded return over the same period was 85.92%, that principal would have grown to $4.84 billion—$699.3 million more than the Fund delivered. Invested in LSGRX, the strongest of the four (100.73%), it would have grown to $5.23 billion, or $1.08 billion more. Measured against the Fund's benchmark, the Russell 1000 Growth (103.98%), the shortfall would be $1.17 billion, and measured against VRGWX (103.43%), $1.16 billion. Those comparisons further demonstrate the Fund's shortfall. Table 10 measures losses against the LCG Comparator Funds.

218. For the SC Fund, the $1,637,107,813 the Plan held in the Fund as of December 31, 2024, implies a principal of $1.20 billion at the start of 2023 (the assets divided by 1.3660). Invested across the SC Comparator Funds, whose average cumulative compounded return for 2023 through 2025 was 52.20% against the Fund's 36.60%, that principal would have grown to $1.82 billion—$187.0 million more than the Fund delivered. Invested in TISEX, the strongest of the four (60.74%), it would have grown to $1.93 billion, or $289.4 million more. Measured from January 1, 2024 instead, the shortfall against the average is $97.6 million and against TISEX $198.0 million.

219. For the State Street TDF Series, the same computation from January 1, 2024 for each of the six vintages yields shortfalls against the Comparator TDF average of $13.5 million (2035), $40.4 million (2040), $36.7 million (2045), $40.2 million (2050), $15.8 million (2055), and $7.2 million (2060)—$153.8 million in all—and, against Fidelity Freedom, the strongest comparator at every vintage, $243.2 million in all (each total

computed from the unrounded figures, as in Table 10). The Series trailed its comparators in the first full calendar year after Defendants selected it.

220. The losses continue to accrue. Every figure above is stated through December 31, 2025; the Challenged Funds remain in the Plan.

221. Despite years of underperformance and a marketplace teeming with better performing investment options, Defendants did not remove the Challenged Funds from the Plan.

222. Defendants' decision to retain the Challenged Funds was as imprudent as it was injurious to the Plan and its participants. Years of underperformance in comparison to the funds' comparators is difficult, if not impossible, to justify.

223. Defendants breached their fiduciary duty of prudence by retaining the Challenged Funds—resulting in a devastating impact on Plaintiffs' and their fellow participants' retirement accounts, simultaneously impairing the Plan's overall investment performance and wasting millions in retirement savings.

224. Any fiduciary would have seen that the poor performance of the LCG Fund, SC Fund, and State Street TDF Series warranted the selection of new large growth, small cap, and target date options—particularly given that such underperformance was sustained for so long.

225. The Defendants' breaches have had a profound adverse effect on the Plan and its participants. The overall breadth and depth of the Challenged Funds' underperformance raises a plausible inference that Defendants' selection and monitoring process was tainted by a lack of competency and/or complete failure of effort.

### F. Prior Litigation Put Wells Fargo on Notice of Its Imprudent Process

226. This is not the first time Wells Fargo's stewardship of the Plan has been challenged under ERISA. On March 13, 2020, a Plan participant filed the *Becker* Action, a putative class action, against Wells Fargo, Wells Fargo Bank, National Association, Galliard Capital Management, Inc., and the Committee, among other defendants, alleging—in the words of the Plan's Form 5500 filings—"that several investment options in the Plan charged excessive fees, underperformed comparable to investment alternatives, and paid fees to Wells Fargo." The settlement agreement in the *Becker* Action defined the term "Challenged Funds," as used in that settlement, as eight investments, including the Wells Fargo/State Street Target Date Collective Investment Trusts—the Plan's target date funds and qualified default investment alternative through 2020 (¶ 60, *supra*)—and the "Small Cap Fund, including the Wells Fargo Emerging Growth Fund but not including any of its non-Wells Fargo component funds" (¶ 137, *supra*). The LCG Fund was not among them. The defendants' motion to transfer the action to this District was granted on September 21, 2020 "pursuant to the Plan's forum selection clause."[49]

227. On May 12, 2021, this Court denied the defendants' motion to dismiss, finding that the plaintiff "has adequately pled ERISA fiduciary breach and prohibited transactions claims against Defendants" and that "whether any prohibited transaction

[49] The quoted descriptions of the *Becker* Action are taken from the Plan's Forms 5500 for 2020 through 2023, Note 13 (Legal Actions); the 2020 note lists the challenged investments. Those notes name the Committee as "the Employee Benefits Review Committee."

exemption applies…is an affirmative defense that cannot be resolved on a motion to dismiss." *Becker* Action, 2021 WL 1909632, at *7 (D. Minn. May 12, 2021). The Court's ruling thus reflects an independent judicial determination that allegations of the same character as those asserted here—concerning Wells Fargo's prior selection and retention of underperforming funds in the Plan and its transactions with parties in interest—were sufficient to state claims for breach of fiduciary duty and for prohibited transactions under ERISA.

228. The *Becker* Action resolved through a class-wide settlement of $32.5 million, which this Court approved on August 31, 2022, dismissing all claims with prejudice as of the settlement's effective date. *Becker* Action, ECF No. 283, at 6–7 (D. Minn. Aug. 31, 2022). The Plan's Form 5500 filings report that "[t]he effective date of the settlement was October 3, 2022," and that the settlement funds were distributed to participants on February 7, 2023. Under ERISA, fiduciaries have a continuing duty to monitor plan investments and to remove imprudent ones. *See Tibble*, 575 U.S. at 530 ("[A] fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones.").[50]

229. Even in the face of this judicial determination and this settlement, Wells Fargo failed to correct its process. Wells Fargo kept the *Becker*-challenged Emerging Growth sleeve, managed by a party in interest, inside the SC Fund until December 4, 2023. It retained the LCG Fund and the SC Fund after each had fallen behind the average of its

---

[50] *Becker* Action, ECF No. 283, at 6–7; 2022 and 2023 Forms 5500, Note 13 (Legal Actions).

comparators on both the three- and five-year trailing windows. And within six months after the settlement became final, it selected as the Plan's new target date series and default investment a series whose published record trailed the American and Fidelity Comparator TDFs on both standard monitoring windows.

### G. Plaintiffs' Claims Are Timely

230. Plaintiffs' claims are timely. A fiduciary's duty to monitor a plan's investments is continuing, and a failure to remove an imprudent investment within a reasonable time is a breach of that duty. *Tibble*, 575 U.S. at 529–30. The Class Period begins six years before the filing of this action. 29 U.S.C. § 1113(1). The breaches alleged continued through the Class Period: Defendants retained the LCG Fund throughout it, retained the SC Fund after its record turned at year-end 2022, and selected the State Street TDF Series effective March 31, 2023, and retained it thereafter. Plaintiffs did not acquire actual knowledge of the breaches alleged here more than three years before this action was filed. 29 U.S.C. § 1113(2). The Plan's disclosures to participants reported each fund's returns and, beyond a general statement that the Plan's named fiduciary regularly reviews the investment funds, said nothing about the process by which Defendants selected and retained the funds.

## CLASS ACTION ALLEGATIONS

231. Plaintiffs bring this action as a class action on behalf of all participants and beneficiaries of the Plan pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and/or (b)(3). Specifically, Plaintiffs bring this action on behalf of the following class (the "Class"):

All participants and beneficiaries of the Plan who, from October 5, 2020 through the date of judgment, invested in one or more of the following funds:

(i) Large Cap Growth Fund;
(ii) Small Cap Fund;
(iii) The following six vintages of the State Street TDF Series:
    1) State Street Target Retirement 2035 Fund;
    2) State Street Target Retirement 2040 Fund;
    3) State Street Target Retirement 2045 Fund;
    4) State Street Target Retirement 2050 Fund;
    5) State Street Target Retirement 2055 Fund;
    6) State Street Target Retirement 2060 Fund.

The Class excludes Defendants, any officers and directors of Wells Fargo, at all relevant times, or employees with responsibility for the Plan's investment or administrative functions, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

Plaintiffs do not assert on behalf of the Class any claim released by the class settlement in the *Becker* Action. The claims concerning the Large Cap Growth Fund concern a fund that was not among the settlement's "Challenged Funds," and was not mentioned in the *Becker* complaint. The claims concerning the Small Cap Fund rest on Defendants' retention of the Fund after its record turned at year-end 2022, and the losses Plaintiffs seek for it are measured from January 1, 2023; both post-date the settlement's finality on October 3, 2022, which released claims "for actions during the period March 13, 2014 through the date on which the Settlement becomes Final," *Becker* Action, ECF No. 248-1, § 1.32, and carved out of that release "[c]laims arising exclusively from conduct after the Settlement becomes Final," *id.* § 1.32.1(c). According to the Plan's Form 5500 filings, the effective date of the *Becker* settlement was October 3, 2022. The claims concerning the State Street TDF Series rest on Defendants' selection of the Series effective March 31, 2023, and its retention thereafter, conduct that post-dates the settlement's finality; the target date funds challenged in the *Becker* Action were the Wells Fargo/State Street Target Date Collective Investment Trusts the Plan held through 2020 (¶¶ 60, 226, *supra*).

232. This action may be certified as a Class under Rule 23(a)(1) as the members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only

through appropriate discovery, Plaintiffs believe that there are tens of thousands of members of the proposed Class. Members of the Class may be identified from records maintained by Wells Fargo and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

233. Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs were each participants during the Class Period and all participants invested in the Challenged Funds during the Class Period were harmed by Defendants' misconduct.

234. Plaintiffs will fairly and adequately protect the interests of the members of the Class as they each participated in the Plan during the Class Period, are committed to vigorous representation of the Class, and have retained counsel competent and experienced in class litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

235. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because Defendants owed the same fiduciary duties to the Plan and all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Among the questions of law and fact common to the Class are:

(a) whether each of the Defendants is a fiduciary liable for the remedies provided by 29 U.S.C. § 1109(a);

(b) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by employing an imprudent process for monitoring and evaluating the Plan's investment options;

(c) whether Plaintiffs' claims of an imprudent process require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Class;

(d) what are the losses to the Plan resulting from each breach of fiduciary duty;

(e) what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches;

(f) whether Defendants caused the Plan to engage in transactions prohibited by 29 U.S.C. § 1106, and what fees and profits must be disgorged as a result; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

236. Certification under Rule 23(b)(1) is appropriate as prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plan would, as a practical matter, be

dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

237. Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiffs seek reformation of the Plan to include more viable retirement investment options, which will benefit the Plan and other participants in the Plan.

238. Additionally, or in the alternative, this action may be certified as a Class under Rule 23(b)(3) as questions of law or fact common to members of the Class predominate over any questions affecting individual members of the Class, and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I
**Breach of the Duty of Prudence in Selecting the State Street TDFs and in Failing to Remove Imprudent Investments from the Plan Within a Reasonable Time**
**(Violation of ERISA, 29 U.S.C. § 1104)**
**(Against All Defendants)**

239. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

240. Wells Fargo used the Plan as a strategic and financial benefit to recruit and retain workers.

241. In joining Wells Fargo and subsequently enrolling in the Plan, employees trusted and relied on Wells Fargo's resources and expertise to construct and maintain a state-of-the-art retirement plan.

242. At all relevant times during the Class Period, Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets.

243. 29 U.S.C. § 1104(a)(1)(B) requires a plan fiduciary to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

244. Thus, the scope of the fiduciary duties and responsibilities of Defendants include administering the Plan with the care, skill, diligence, and prudence required by ERISA. Defendants are responsible for evaluating and monitoring the Plan's investment options on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plan's assets are invested prudently.

245. Defendants breached their fiduciary duties by adopting an imprudent process for evaluating and monitoring investment options in the Plan. The faulty process resulted in the Plan's inclusion of a single large growth fund (the LCG Fund), a single small cap fund (the SC Fund), and a single suite of target date funds (the State Street TDF Series)—each of which underperformed the average of its comparator funds on every trailing three-

year window ending 2021 through 2025 and on the trailing five-year and ten-year windows ending 2025. That process is manifest in three decisions. First, Defendants retained the LCG Fund and the SC Fund after each had fallen behind the average of its comparators on both the three- and five-year trailing windows. Second, in March 2023 they selected a target date series whose published record trailed the American and Fidelity Comparator TDFs and retained that series as it continued to underperform. Third, they retained within the SC Fund, until December 4, 2023, a party-in-interest sleeve that the *Becker* Action had challenged.

246. By failing to adequately consider better-performing investment products for the Plan, Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

247. Defendants' breach of fiduciary duty has substantially impaired the Plan's value and investment performance for all Class members.

248. As a direct and proximate result of Defendants' breaches of fiduciary duty, the Plan and its participants who invested in the Challenged Funds have suffered damages and lost-opportunity costs of approximately $1.04 billion, which continue to accrue. Table 10 also sets out the alternative estimates of approximately $950.7 million and $1.62 billion. Defendants are jointly and severally liable for the resulting losses pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a).

249. Each of the Defendants is liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits resulting from the

breaches of fiduciary duties alleged in this Count and is liable for other equitable or remedial relief as appropriate.

250. Each Defendant also participated in the breach of the other Defendants, knowing that such acts were a breach, and enabled the other Defendants to commit a breach by failing to lawfully discharge its fiduciary duties. Each Defendant knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

251. The Plan Administrator is liable as a co-fiduciary under 29 U.S.C. § 1105(a)(3). Through the persons holding that office at each filing, it signed and filed the Plan's annual reports for 2020 through 2024. Those reports listed the LCG Fund and the SC Fund, with their sleeves, on the Plan's schedules of assets, and the reports for 2023 and 2024 listed the Series; the reports for 2020 through 2023 described the *Becker* Action and, beginning with the 2021 report, its settlement; the schedules of assets for 2020 through 2022 marked the Emerging Growth sleeve as a party-in-interest holding; and the reports for 2022 through 2024 described the Plan's transactions with Allspring.[51] With that knowledge of the Committee's retention of the LCG Fund and the SC Fund, of its selection and retention of the Series, and of the Allspring transactions, the Plan Administrator made no reasonable effort under the circumstances to remedy those breaches.

---

[51] Forms 5500 for 2020 through 2024, each signed and filed by the Plan Administrator, including Schedule H, line 4i (schedule of assets), Note 13 (Legal Actions) of the 2020 through 2023 filings, and the related-party and party-in-interest notes.

**COUNT II**
**Failure to Monitor**
**(Against All Defendants)**

252. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

253. Defendants had a duty to monitor the performance of each individual to whom they delegated any fiduciary responsibilities. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of the Plan's assets, and must take prompt and effective action to protect the Plan and participants when they are not.

254. To the extent any Defendant's fiduciary responsibilities were delegated to another fiduciary, such Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

255. Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

(b) failing to establish a fiduciary process and failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment option in violation of ERISA;

(c) failing to establish a prudent process for evaluating and ensuring that the Plan's investment options were prudent; and

(d) failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan to the detriment of Plan participants' retirement savings.

256. Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

(a) failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

(b) failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

(c) failing to implement a process to ensure that the appointees had a prudent process in place for evaluating and ensuring that the Plan's investment options were prudent; and

(d) failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan to the detriment of Plan participants' retirement savings.

257. As a direct result of these breaches of the fiduciary duty to monitor, the Plan has suffered substantial losses. Had Wells Fargo and the other delegating fiduciaries

prudently discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

**COUNT III**
**Prohibited Transactions**
**(Violation of ERISA, 29 U.S.C. § 1106(a)(1)(C)–(D))**
**(Against All Defendants)**

258. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

259. ERISA prohibits a plan fiduciary from causing the plan to engage in a transaction that the fiduciary knows or should know constitutes a direct or indirect furnishing of services between the plan and a party in interest, 29 U.S.C. § 1106(a)(1)(C), or a transfer to, or use by or for the benefit of, a party in interest of any assets of the plan, 29 U.S.C. § 1106(a)(1)(D). A "party in interest" includes any person providing services to the plan. 29 U.S.C. § 1002(14)(B).

260. Allspring, acting through a subsidiary, managed the SC Fund's Emerging Growth sleeve and, through that subsidiary, provided investment management services to the Plan. That sleeve is printed on the Plan's schedules of assets as "Wells Fargo Emerging Growth E4" as of December 31, 2021 and as "Allspring Emerging Growth CIT E4" as of December 31, 2022, and it is marked by the Plan on each of those schedules as a party-in-interest holding. Allspring was therefore a party in interest with respect to the Plan. The Plan's 2023 Form 5500 identifies Allspring Global Investments, LLC on Schedule C, Part I, line 1b, as a person providing the required disclosures for service providers that received only eligible indirect compensation, and the Plan's financial statements acknowledge that

"[t]he Company has a noncontrolling interest in Allspring, which may be considered a party-in-interest with respect to the Plan." This Count does not concern the Plan's Stable Value Fund, whose manager is also an Allspring subsidiary and whose investment management fees the Plan's financial statements state the Company pays.[52]

261. After the *Becker* settlement became final on October 3, 2022, and through December 4, 2023, Defendants caused the Plan to continue to hold the Allspring Emerging Growth sleeve within the SC Fund—$255.0 million of Plan assets as of December 31, 2022—and, on information and belief, to pay, directly or indirectly from Plan assets, investment management fees to Allspring for its management of that sleeve. The Plan's 2023 and 2024 Form 5500 filings confirm that the Plan "engaged in transactions involving acquisition or disposition of units of participation in certain investments managed by a subsidiary of Allspring … through December 4, 2023."

262. Defendants' continued engagement of Allspring to manage the sleeve after October 3, 2022, was a transaction that Defendants knew or should have known constituted a direct or indirect furnishing of services between the Plan and a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C), and each payment of fees from the sleeve to Allspring was a transfer of Plan assets to, and a use of Plan assets for the benefit of, a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D). Defendants marked the sleeve as a party-in-interest holding on the Plan's filings and acknowledged in those filings that

---

[52] 2023 Form 5500, Schedule C, Part I, line 1b; 2022–2024 Forms 5500, related-party notes; 2021 and 2022 Forms 5500, Schedule H, line 4i (the asterisked sleeve).

Allspring "may be considered a party-in-interest with respect to the Plan." The Plan Administrator signed and filed each of those reports.

263. The Supreme Court has held that plaintiffs "seeking to state a § 1106(a)(1)(C) claim must plausibly allege that a plan fiduciary engaged in a transaction proscribed therein, no more, no less," and "are not required to plead and prove that the myriad § 1108 exemptions pose no barrier to ultimate relief." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 709 (2025); *see id.* at 700 (citing *Braden*, 588 F.3d at 600–02). This Court reached the same conclusion in the *Becker* Action: "whether any prohibited transaction exemption applies … is an affirmative defense that cannot be resolved on a motion to dismiss." *Becker* Action, ECF No. 134, at 16. The Plan's financial statements assert that the Allspring transactions, "even if considered parties-in-interest transactions under ERISA regulations, are covered by an exemption from the 'prohibited transaction' provisions of ERISA and the IRC," and the Plan's 2022, 2023, and 2024 Forms 5500 answer "No" to the Schedule H question whether the Plan engaged in any nonexempt transaction with a party in interest. Those are Defendants' characterizations of their transactions. Whether any exemption applies is an affirmative defense that Defendants bear, and the Forms 5500 identify no exemption. Plaintiffs do not assert any claim released in the *Becker* Action; the transactions alleged in this Count occurred after the *Becker* settlement became final.

264. The Plan Administrator, which reported the Allspring transactions in the Plan's annual reports and characterized them there as exempt, knew of them and made no

reasonable effort under the circumstances to remedy them, and is liable for them as a co-fiduciary under 29 U.S.C. § 1105(a)(3).

265. As a direct and proximate result of these prohibited transactions, the Plan paid fees to a party in interest that it should not have paid, and Allspring received fees from Plan assets. Plaintiff Roseborough held the SC Fund, and through it the Allspring sleeve, from no later than March 31, 2023 through the end of that period, and Plaintiff Scott held it as of December 31, 2022 and into the third quarter of 2023; the fees paid from the sleeve reduced the value of their accounts. Defendants are liable to restore to the Plan the losses resulting from each such transaction and to disgorge to the Plan the fees and profits obtained through the use of Plan assets, and are subject to such other equitable or remedial relief as the Court may deem appropriate, pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3).

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

i) find and adjudge that Defendants have breached their fiduciary duties, as described above;

ii) find and adjudge that Defendants caused the Plan to engage in transactions prohibited by 29 U.S.C. § 1106;

iii) find and adjudge that Defendants are personally liable to make good to the Plan the losses to the Plan resulting from each breach of fiduciary duty, and

to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

iv) find and adjudge that Defendants are liable to the Plan for appropriate equitable relief, including but not limited to restitution and disgorgement;

v) determine the method by which the Plan's losses under 29 U.S.C. § 1109(a) should be calculated;

vi) order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

vii) remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

viii) impose a surcharge against Defendants and in favor of the Plan in the amount of all sums involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

ix) reform the Plan to include only prudent investments;

x) certify the Class, appoint Plaintiffs as class representatives, and appoint Kahn Swick & Foti, LLC as Class Counsel;

xi) award to the Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

xii) order Defendants to pay interest to the extent allowed by law; and

xiii) grant such other equitable or remedial relief as the Court deems appropriate.

Date: October 5, 2026

*<u>/s/ David W. Asp.</u>*
David W. Asp (MN Bar No. 0344850)
Derek C. Waller (MN Bar No. 0401120)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4091
Facsimile: (612) 339-0981
Email: dwasp@locklaw.com
Email: dcwaller@locklaw.com

- AND -

Michael J. Palestina (LA Bar No. 31907)*
John A. Carriel (DC Bar No. 888241661)*
Gina M. Palermo (LA Bar No. 33307)*
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 648-1842
Facsimile: (504) 455-1498
Email: michael.palestina@ksfcounsel.com
Email: john.carriel@ksfcounsel.com
Email: gina.palermo@ksfcounsel.com
*Pro hac vice applications forthcoming

*Attorneys for Plaintiffs, the Plan, and the Proposed Class*